IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 10, 2003 Session

## STEVEN SCOTT MEANS, ET AL. v. DAVID VINCENT ASHBY, ET AL.

Appeal from the Circuit Court for Davidson County
No. 00A-35    Muriel Robinson, Judge

No. M2002-00285-COA-R3-CV - Filed October 6, 2003

Current custodian of Minor Child petitioned the court for termination of parental rights of both parents. Petitioners are the brother and sister-in-law of Minor Child's mother. The parents of the Minor Child are divorced. Mother had no contact with Minor Child for over a year prior to the Petition, and Father has had no contact for approximately five years. We find that any failure to visit by the parents and failure to support by the Mother was not willful and affirm the trial court in dismissing the Petition to Terminate their parental rights. However, the trial court's custody determination is vacated, and that issue is remanded for further consideration.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and VERNON NEAL, SP. J., joined.

Michael W. Binkley, Nashville, Tennessee, for the appellants, Steven Scott Means and Cheryl Lynn Means.

Phillip R. Robinson and James C. Bradshaw, III, Nashville, Tennessee, for the appellee, David Vincent Ashby.

**OPINION**

I. Case History

Appellee, Tawni Means Little (hereinafter 'Ms. Little'), was adopted into the Means family when she was approximately one month old. Ms. Little is the mother of the child at issue in this case, M.A., who was born in December of 1991. Her brother and sister-in-law, Scott and Cheryl Means, are Appellants in this case and currently have custody of Ms. Little's child, M.A.. They have requested that the parental rights of Ms. Little and David Ashby (father of M.A.) be terminated.

Ms. Little lost her mother after an extended illness in 1999, after which Cheryl Means became the primary mother figure in her life. She was engaged to David Ashby in 1991 and became pregnant at the age of twenty prior to their marriage. Ms. Little and Mr. Ashby broke up prior to birth of their daughter.

After the break up, Ms. Little and the Means family determined that the child should be given up for adoption. This action was opposed by Mr. Ashby, who filed a petition to stop the adoption and legitimate M.A. In these proceedings, he was ordered to pay child support, which he has continued to pay through the date of this trial. He was also given visitation, of which he took full advantage until Ms. Little and Mr. Ashby reconciled and eventually married on May 22, 1992.

After their marriage, Ms. Little and Mr. Ashby lived with his parents for a period of time, then moved into an apartment and ultimately resided in a house purchased by Mr. Ashby's parents. Mr. Ashby held several jobs during the marriage including working as a clown for Shoe Carnival, working at the Nissan Plant and working summers at Opryland operating rides. However, he was unable or unwilling to keep a full time job with benefits for any length of time. On March 5, 1993, a second child was born to the couple; however, this child died shortly after birth.[1] Subsequently, the couple began to experience marital difficulties.

M.A. suffered from a condition known as labia fusion from the time she was a small baby. This condition caused sores on her genital area. Throughout most of her life, M.A. has been treated medically for this condition.

In the summer of 1994, Ms. Little, with the encouragement of the Means family, began to suspect that Mr. Ashby might be sexually abusing their daughter.[2] Ms. Little left Mr. Ashby and moved to Sedona, Arizona with her father in July of 1994. Ms. Little and M.A. moved into the home of her father, Fred Means, and his wife, Kathy Means, where they lived for several months after the relocation. However, no divorce proceedings were filed at this time.

After Ms. Little's move to Arizona, Mr. Ashby continued to maintain contact with the child by telephone until October of 1994, at which time he began having trouble contacting them. In November of 1994, Ms. Little and her daughter moved into an apartment with no telephone, and Mr. Ashby was never provided with her address. Mr. Ashby continued to send cards and gifts to the child at Fred Means' address in Sedona, Arizona, many of which were returned to him.

In May of 1995 Ms. Little was accused by her stepmother, Kathy Means, of stealing money at her job. She was subsequently fired from this job at her father's dry cleaners, where she had worked since moving to Arizona. After losing her job, she and M.A. moved to the Indian reservation

---

[1] During the marriage, Mr. Ashby experienced other very tragic family losses. On July 4, 1992 one of his brothers shot and killed his other brother. Then, in February 1995, his remaining brother killed himself.

[2] No medical proof of sexual abuse was presented at trial, and the sexual abuse allegation was not a basis alleged for termination of his parental rights.

in Taos, New Mexico, where her biological mother lived. She found the conditions at this reservation to be extremely poor, and after approximately five to six weeks, she contacted Scott and Cheryl Means to ask if they would help her return home to Nashville. The Means agreed and bought her and M.A. a plane ticket to return to Tennessee.

When Ms. Little arrived back in Tennessee she was approximately eight months pregnant. The father of this child was a man who had worked at her father's dry cleaners with whom she had had a relationship while living in Arizona. With the assistance of Scott and Cheryl Means, Ms. Little received medical care, gave birth, and placed the baby for adoption. At that time, Mr. Ashby was notified of the birth of the child and, as they were still married, asked to waive his rights to the child. However, Mr. Ashby was never notified that Ms. Little and his daughter had returned to Nashville, nor given an address where they could be reached.

Mr. Ashby filed for divorce in September of 1995. He and Ms. Little met in an attorney's office in November of 1995 to finalize the divorce terms. Mr. Ashby testified that he believed Ms. Little was only in Nashville for a short period of time to take care of the divorce proceedings and would return to Arizona. The divorce papers provided her father's home in Sedona, Arizona as Ms. Little's permanent address.

Under the terms of the divorce, Mr. Ashby agreed not to seek visitation with M.A. until a psychological evaluation had been performed; however, he has continuously denied any abuse of his daughter. Mr. Ashby underwent a psychological evaluation by Harry B. Stuber, a licensed clinical psychologist, in March of 1996, which lasted approximately three to four weeks. At age 27, Mr. Ashby was found to be extremely immature, functioning on only an adolescent level. He was also found to have dependency issues and problems with inadequacy and low self esteem. Mr. Stuber recommended that Mr. Ashby obtain counseling in order to "achieve the appropriate emotional and mental status that will be appropriate for a good relationship with your daughter, including extended visitation rights." Mr. Ashby subsequently sought counseling from a pastoral counselor who was a friend of the family.

Mr. Ashby attempted to return to school after his separation but has had great trouble in maintaining grades that allowed him to remain in school. After seven years of taking sporadic classes and passing few, he was still classified as a freshman. He has also been working as a part time actor and spending time participating in role-playing games. For the three months prior to trial he held a job with a rental home locator service. Of Mr. Ashby's work record, the trial court stated:

> He bounces from job to job. He had a wonderful job at Nissan and didn't keep that because he wouldn't go to work. He had a wife and child to support, yet he didn't do a very good job at that.
> There's certainly some discrepancies in his testimony. He seems to enjoy being an unemployed actor more than being a mature adult and working at a steady job, every day and desiring to support and parent his child.

Fortunately he did support his child up until the date - - up until the trial date, I guess, but certainly up until the date that the adoption was filed, he supported the child by paying child support which was ordered by the Court. Even though it came through his father, obviously, but still that can be attributed to him and the child support was paid.

After the divorce proceedings, Ms. Little and M.A. continued to reside in Nashville with Scott and Cheryl Means. Scott Means provided her with a job at one of his grocery stores, and Ms. Little often did ironing and babysitting for Cheryl Means. Neither Ms. Little, nor any of the Means family, ever contacted Mr. Ashby to make him aware that Ms. Little and his daughter were residing in Nashville.

Ms. Little testified that, while she resided with the Means, Cheryl Means exercised undue control over her life and finances, dictating her living arrangements, monitoring her checking account, and mandating what portion of her income could be spent. Eventually, with the assistance and approval of Cheryl Means, Ms. Little was able to move into an apartment. However, while living in her apartment she began a relationship with her current husband, Ron Little. Shortly after taking up residence in her apartment, she abandoned the apartment to live with Mr. Little, as her apartment would not allow another occupant. During her time in her apartment and after moving in with Mr. Little, M.A. continually lived with Ms. Little, who remained her primary caretaker.

In November of 1997, while Ms. Little and Mr. Little were living in an apartment together, the Means suspected Ms. Little of stealing money from one of the grocery stores. Cheryl Means entered Ms. Little's apartment with a key that she held and began to search for evidence of the theft. Upon finding evidence of the theft, Cheryl contacted her mother to take M.A. Scott Means then joined her at Ms. Little's residence to wait for Ms. Little's return and confront her regarding the theft. When Ms. Little returned, M.A. was taken from her and given to Cheryl's mother. Ms. Little was then confronted regarding the theft, which she admitted after being shown the evidence found in her apartment. Her father was also present at the time she was confronted and, due to fear for her emotional state, drove her to a facility for counseling that evening. Ms. Little was counseled and released that same night. As a result of the theft, she lost her job and insurance benefits.

After the night Ms. Little was confronted, M.A. remained in the Means' custody. In December of 1997, Ms. Little agreed to give Scott and Cheryl Means temporary custody of M.A. The Means testified that Ms. Little requested that they take custody of M.A. until she could get her life back together. Ms. Little testified that the Means insisted they keep custody of M.A. and that she was afraid that if she insisted on regaining custody they would prosecute her for the theft.

Ms. Little and the Means met in an attorney's office on December 22, 1997 in order to sign a custody agreement. Mr. Ashby was given no notice of the custody change and remained unaware that Ms. Little and M.A. were still living in Nashville. The attorney hired to draft the new custody agreement represented the Means. Ms. Little was not represented by counsel. The Means testified that they did not wish to take any child support from Ms. Little, but they had the child support paid

-4-

by Mr. Ashby transferred to them in the new custody Order. Visitation was not agreed upon and left to the Means' discretion.

Ms. Little visited on a fairly regular basis through May of 1998. She testified, however, that the Means made visitation difficult and overly limited her time and access to her child. She testified that the Means would not allow any overnight visitation and eventually stopped taking or returning Ms. Little's phone calls. In August of 1998 she became discouraged and stopped trying to visit due to the hardships created by the Means and her continued fear of being prosecuted if she angered them.

The Means testified that Ms. Little's visitation was erratic and self limiting and that she simply ceased making any attempt to visit. They also testified that they never made any threat of prosecution and merely took M.A. as a favor to Ms. Little.

In late 1999, Ms. Little began trying to contact the Means in order to gain access to her child. At that time, she had secured new employment and was engaged to Ron Little. Mr. Little, who worked at one of the Means' grocery stores, was demoted shortly after Ms. Little's attempt to contact the Means. In February 2000, she wrote letters to both M.A. and her brother, Scott, in an attempt to reconcile with them and re-obtain custody of her daughter. The Means then filed a Petition for Adoption and Termination of Parental Rights.

After an extensive trial, the court found that Mr. Ashby and Ms. Little had been very poor parents to M.A. "They were both totally dependent on their family members and the family members enabled them remain immature, unemployed, and lacks in their parenting of [M.A.]. And certainly it led them not to develop any parenting skills, even though at the time this child was born, they were well over eighteen and now they come before the Court now well into their thirties and they're just immature."

The trial court went on to find that Scott and Cheryl Means, as well as Ms. Little and her father, had interfered with Mr. Ashby's access to M.A. but that Mr. Ashby had continued to support his child up until the date of trial. The trial court denied the adoption petition stating, "[B]ased on the proof and what everybody has done wrong in this case, including Scott and Cheryl Means, including David Vincent Ashby, including the mother, Tawni Means Ashby, now Little, the Court finds that this adoption is not to the best interest and welfare of the child, and, therefore, the petition to adopt and terminate parental rights of the natural mother and father is hereby denied."

She further made the finding that Ms. Little had not willfully failed to visit nor willfully failed to support M.A., and that she had been dominated by the Means. Said the court: "I do find that she had no intention to abandon this child. There was no conduct on the part of either of these parents that evidences a settled purpose to forego all their parental duties and to relinquish claims to the child. The evidence doesn't show a conscientious disregard or indifference to parent this child, it just shows two immature people who were enabled by others to remain immature and not to focus on the best well-being of the child."

The court, however, found that M.A. should remain in the custody of Scott and Cheryl Means stating:

> The Court does find that the aunt and uncle, Mr. and Mrs. Scott Means, have afforded an excellent home for this child, therefore, they will remain the custodians of this child.
>
> The child's been with them four years. Obviously, she thrived, much more in their custody than she ever did with her parents. She's been there four years. She's in school. I note that she's not a really, really good student, but with their coaching she's been able to make the grade. I feel if she were placed with either one of the parents that wouldn't be the case. So at this time in this child's life, based on the evidence presented to me, I find it's to the best interest and welfare of this child that custody remain with Scott and Cheryl Means."

The court went on to fashion visitation and child support for both parents.

A specific inquiry was made of the trial judge regarding the custody decision and whether or not there was a finding of substantial harm or exigent circumstances. The court stated, "Well I didn't say anything in my ruling but I will put in there that the circumstances of this case bear that this child should remain with the aunt and uncle because of the neglect of the parents."

Two issues were presented for review: (1) whether the trial court was correct in finding that the biological parents had not abandoned M.A. by their willful failure to visit or support the child; (2) whether the trial court erred in failing to award custody to the biological mother, Ms. Tawni Little. We agree with the trial court that clear and convincing evidence of abandonment by the parents was not presented. However, the trial court's determination of custody is vacated, and that issue is remanded to the trial court for further consideration.

## II. Abandonment
### A. Law

The first issue presented is whether or not there was clear and convincing evidence of abandonment by David Ashby and Tawni Little that would support a termination of their parental rights. It has been long recognized by the courts in Tennessee that parents have a fundamental right to the care, custody, and control of their children. *See In Re: Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1989). In recognition of this fundamental right, courts apply a higher standard for determining if grounds for termination exist.

> Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and "severing forever all legal rights and obligations" of the parent. Tenn.Code Ann. § 36-1-113(*l*)(1). Because of its consequences, which affect fundamental constitutional rights, courts apply a higher standard of proof when adjudicating termination cases. *See O'Daniel v.*

-6-

*Messier*, 905 S.W.2d 182, 186 (Tenn.Ct.App.1995). To justify the termination of parental rights, the grounds for termination, and the fact that termination is in the best interests of the child, must be established by clear and convincing evidence. *See* Tenn.Code Ann. § 36-1-113(c) (Supp.2000); *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn.Ct.App.1996). "This heightened standard serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d 602, 622 (Tenn.Ct.App.1998).

> The "clear and convincing evidence" standard defies precise definition. While it is more exacting than the preponderance of the evidence standard, it does not require such certainty as the beyond a reasonable doubt standard. Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established.

*O'Daniel*, 905 S.W.2d at 188 (citations omitted).

*Brown v. Rogers*, 2001 WL 92083, at *2-3 (Tenn. Ct. App. Feb. 5, 2001).

"Parental rights may be terminated in only a limited number of statutorily defined circumstances. Before termination, one or more of the asserted statutory grounds must be proved by clear and convincing evidence and the court must determine, also using the clear and convincing evidence standard, that termination is in the child's best interest. *See* Tenn.Code Ann. § 36-1-113(c)(2) Supp. 1999." *In the matter of T.S. and M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *4 (Tenn.Ct.App. July 13, 2000). In the case at bar, the ground alleged for terminating the parental rights of both parents was abandonment. In order to prove abandonment, the petitioner must show a willful failure to visit or willful failure to support the child for four consecutive months immediately preceding the filing of the petition. Tenn.Code Ann. § 36-1-102(1)(A)(i); *Brown*, 2001 WL 92083, at *3. The Tennessee Supreme Court has specifically stated that the element of willfulness must be present; this willfulness contains an element of intent to abandon the child. *In re Swanson*, 2 S.W.3d 180, 189 (Tenn. 1999); *In re Adoption of Copeland*, 43 S.W.3d 483, 488 (Tenn.Ct.App. 2000), *perm. to appeal denied* (April 16, 2000). Based on the facts of this case, we agree with the trial court that there was no clear and convincing evidence of a willful failure to visit or willful failure to support the child by either parent.

B. David Ashby

The Means alleged that Mr. Ashby had willfully failed to support his child by allowing his parents to assist him in paying his child support payments. We find no merit to this argument. All child support payments have been made through the date of trial in this matter, and it is no business of the Means as to where Mr. Ashby obtained the funds.

With regard to his failure to visit M.A. for approximately five years prior to the Means filing their Petition to terminate his parental rights, we agree with the trial court that there is no clear and convincing evidence that this failure to visit was willful. The trial court observed:

> It's obvious that Ms. Little has not really had any contact with this child since 1998 and the father, David Ashby, has not had any contact with this child since 1995, mainly because he didn't have access.
> All the reasons he gives are understandable in that he didn't have the money to go to Arizona, he didn't have the money to actually assert his parental rights.
> If you take that along with the fact that really he's not a very strong person anyway to do anything that a parent would do in a responsible way, you mix all that together and obviously he's not going to make a great effort to see the child.

The trial court specifically found that Scott and Cheryl Means interfered with his visitation, that Fred and Kathy Means interfered with his visitation and that Tawni Means Little interfered with his visitation. The Means family evidenced a strong dislike of Mr. Ashby which, although understandable given their belief that he may have molested M.A., can be seen in their consistent unwillingness to include Mr. Ashby in the life of Ms. Little and M.A. The Means family made a concerted effort to prevent Mr. Ashby from even knowing that his child had been born and then failed to assist him in any way in obtaining knowledge of the whereabouts of M.A. once she had left Fred Means' residence in Sedona, Arizona. The divorce documents even listed Ms. Little's address as her father's residence in Sedona, Arizona even though Ms. Little had not lived there in over a year.

As we find no clear and convincing evidence that Mr. Ashby's failure to visit was willful, whether termination of his parental rights would be M.A.'s best interest is not at issue.

## C. Tawni Little

The trial court made a specific finding that Ms. Little did not wilfully fail to visit or wilfully fail to support her child and found:

> I do find that she had no intention to abandon this child. There was no conduct on the part of either of these parents that evidences a settled purpose to forego all their parental duties and to relinquish claims to the child.
> The evidence doesn't show a conscientious disregard or indifference to parent this child, it just shows two immature people who were enabled by others to remain immature and not to focus on the best well-being of the child.

The trial court found that she was an extremely weak and immature person who had been dominated by the Means. The evidence is undisputed that Ms. Little was caught stealing several thousand dollars from her brother's business, which led to a period of unemployment. Ms. Little was left without the financial resources to challenge the Means for her child, and her fear of retribution is

-8-

understandable. Although it is also undisputed that Ms. Little had no contact with her child for over a year and a half prior to the Means filing the Petition, she attempted to establish contact prior to the Means filing their Petition to terminate her parental rights. Further, the evidence presented in no way makes out a clear a convincing case that Ms. Little intended to abandon her child.

Once again, as abandonment has not been proven, it is not necessary for the Court to discuss the child's best interests in this regard.

### III. Custody

The trial court, having correctly determined that the parental rights of neither the natural father nor the natural mother could be terminated under the proof offered in the case, then turned to the issue of custody. It is hard to conceive of factual circumstances that could more sharply bring into focus the difficulties facing a court in child custody cases. We have an immature natural mother who has heretofore displayed little in the way of parental fitness. We have an equally immature natural father who has had little contact with the child but, with the help of his parents, has consistently paid child support. We have paternal grandparents who have lived with personal tragedy but have strongly pushed their son to accept his parental responsibilities. We have Scott Means, older brother of the biological mother, and his wife Cheryl Means, who have taken over as substitute parents for the minor child, and with no small amount of justification, have dominated the life of the natural mother. We have a maternal grandfather and step grandmother who have acquiesced in and assisted with the domination by Scott and Cheryl Means over Ms. Little's life and that of the minor child. Except for the minor child, there are no "faultless" people in this case.

Two decisions of the Tennessee Supreme Court control the standards by which the action of the trial court must be reviewed in this case. First, we have *In re Askew*, 993 S.W.2d 1 (Tenn. 1999) and second we look at *Blair v. Badenhope*, 77 S.W.3d 137 (Tenn. 2002). *Askew* makes clear that, in an initial custody dispute between parents and non-parents, a natural parent may only be deprived of custody of a child upon a showing of substantial harm to the child. This rule is modified by *Blair,* which holds that the superior parental rights established in *Askew* do not apply where a valid court order of custody is in place at the time the natural parent attempts to gain custody. In such cases, the natural parent must prove a material change in circumstances that would make a custody change in the child's best interest.

Since the natural father, David Vincent Ashby, was not a party to the Order of December 29, 1997 entered in the Rutherford County Circuit Court, that Order, is ineffective as to him. Thus, his case is reviewable under *Askew* without regard to *Blair*. The natural mother, Tawni Anne Means Ashby Little, however, is a party to the December 29, 1997 Order, and whether or not her rights are controlled by *Askew* or by *Blair* depends on the effect of the December 29, 1997 Order on her.

Examining the principles applied in each of these cases with respect to custody modification issues, a natural parent enjoys the presumption of superior rights under four circumstances: (1) when no order exists that transfers custody from the natural parent; (2) when the order transferring custody from the natural parent is accomplished by fraud or without notice to the parent; (3) when the order transferring custody from the natural parent is invalid on its face; and (4) when the natural parent cedes only temporary and informal custody to the non-parents. Consequently, when any of these circumstances are present in a given case, then protection of the right of natural parents to have the care and custody of their children demands that they be accorded a presumption of superior parental rights against claims of custody by non-parents.

*Blair*, 77 S.W.3d at 143.

The difficulty is that the determinative Order of the trial court in this case of October 19, 2001 post-dates *Askew* but pre-dates *Blair*. The trial court, thus, did not address the question of the effect of the Rutherford County Custody Order entered December 29, 1997. This Rutherford County Order states:

> This cause came on to be heard on the Petition filed jointly by the Mother of the minor child, who has sole custody, and the Aunt and Uncle of the minor child, with whom the child has lived for a period of approximately two years. The Petitioners respectfully request that custody be changed to the Uncle and his wife, Steven and Cheryl Means, as it is in the best interest of the child, and the Court finding that it is in the best interest of the child, it is hereby
> ORDERED that custody of the minor child, Mariah Anne Ashby is hereby placed with Steven Scott Means and his wife, Cheryl Anne Means. It is further
> ORDERED that the Clerk of the Court will forward to Steven Scott Means the child support payment of $215.00 currently being paid by the Father for the minor child, with that $215.00 per month being forwarded to Steven Scott Means at 3323 Old Hickory Blvd., Old Hickory, TN 37138. It is further
> ORDERED that the costs of this cause are taxed to the Petitioners.

This custody Order appears on its face to be valid. However, when it was being investigated at the trial of this case and the attorney who had drafted the instrument testified, the trial court was much concerned about the Order and about the fact that the attorney was representing only Petitioners, Scott and Cheryl Means, and not the natural mother, as well as the fact that no service of process was ever had on David Vincent Ashby. It seems also clear from the testimony of the attorney drafting the Order that the primary purpose was to allow the minor child to be covered by insurance. The Order could not bind David Vincent Ashby, as it clearly comes within the second exception set forth in *Blair* since the Order was without notice to David Ashby. However, the question that cannot be answered by the record is whether or not, as to the natural mother, the fourth

exception in *Blair* is applicable. This exception is, "when the natural parent cedes only temporary and informal custody to the non-parents." *Blair*, 77 S.W.3d at 143.

The trial court made a "best interest of the child" evaluation as to custody and then vested custody in Scott and Cheryl Means. As to the natural father, David Ashby, this analysis is in error, and as to the natural mother, Tawni Little, this analysis is in error unless the trial court finds the December 29, 1997 Order in the Circuit Court of Rutherford County to be valid as to the natural mother under *Blair v. Badenhope*.

We therefore vacate the judgment of the trial court and remand the case for further consideration by the trial court in light of *Blair v. Badenhope*. The analysis to be made by the trial court as to David Vincent Ashby is the analysis mandated by *In re Askew*. The analysis to be made as to Tawni Little is, first, to determine the effect of the December 29, 1997 Rutherford County Order on her. If the Order is effective, she must show a material change of circumstance, and only then, may the court make a best interest analysis. *See Blair*, 77 S.W.3d 137. If the Rutherford County Order is not binding on the natural mother, then her rights also must be determined under an *Askew* analysis. In an *Askew* analysis a natural parent can only be denied custody upon a specific finding of substantial harm to the child. *See Askew*, 993 S.W.2d 1.

The situation is further complicated by the fact that the natural parents are not married to each other but have separate households. If a natural parent is to prevail, the trial court must decide the custody issue between those natural parents.

The action of the trial court in dismissing the Petition to Terminate the parental rights of David Ashby and Tawni Little is affirmed. The judgment of the trial court granting custody to Scott and Cheryl Means is vacated, and the case is remanded to the trial court for further consideration of custody issues in conformity with this Opinion. Pending such consideration custody will remain vested in Scott and Cheryl Means.

Costs of the cause are assessed against Steven Scott Means and Cheryl Lynn Means.

---

        WILLIAM B. CAIN, JUDGE