# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 14, 2005

## IN RE A.B., T.B., E.B., AND B.M.

## STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES
### v.
## BELINDA MEDLIN

**An Appeal from the Juvenile Court for Carroll County**
**No. JC-2754-99      Larry J. Logan, Judge**

---

**No. W2004-02808-COA-R3-PT - Filed December 27, 2005**

---

This is a termination of parental rights case. In 1999, DCS removed three of the four children living with mother from the mother's home. They were found to be dependent and neglected, and placed in the custody of DCS. The children were in foster care until October 2002, when they were returned to the mother. By that time, the fourth child had been born. In May 2003, all four children were again removed from the mother's custody based on reports that the mother had left the children unsupervised, and that the eighteen-month-old was found in the street and was almost hit by a car. Authorities later discovered that minors had been drinking alcohol in the mother's home, and that the mother had struck one of the children in the eye and told her to lie about the resulting bruise. The trial court again found the children to be dependent and neglected. The mother and DCS entered into a permanency plan with several requirements for the mother to complete in order to regain custody of the children. Eight months later, DCS filed the instant petition to terminate the mother's parental rights, alleging, *inter alia*, that the conditions which led to the removal of the children from the mother's home persisted. The trial court granted the petition and terminated the mother's parental rights. The mother now appeals. We affirm, finding ample evidence on the ground of persistent conditions, as well as clear and convincing evidence that termination of the mother's parental rights was in the children's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Jeffery T. Washburn, Dresden, Tennessee, for the appellant, Belinda Medlin.

Paul G. Summers, Attorney General and Reporter, and Elizabeth C. Driver, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

**OPINION**

Respondent/Appellant Belinda Medlin ("Mother") and William Blackard ("Father") are the natural parents of the four children involved in this case, A.B. (daughter, born 1/5/96), T.B. (daughter, born 9/11/97), E.B. (daughter, born 5/24/99), and B.M. (son, born 11/5/01). Mother and Father were never married.

Petitioner/Appellee State of Tennessee Department of Children's Services ("DCS") has been involved with Mother and the children since August 1999. On August 30, 1999, DCS filed the first petition in this case alleging that the three children (B.M. had not yet been born) were dependent and neglected, asserting that Mother had been arrested for driving under the influence ("DUI") while the children were unrestrained in the car with her, that the children had lice and intestinal parasites, and that there were no relatives willing to care for them. The children remained in foster care from August until November 1999, when the trial court transferred custody of the three children to the paternal grandparents, William and Talma Blackard. On September 12, 2000, the children were returned to foster care because their grandparents could no longer care for them, Mother was incarcerated, and Father was either unwilling or unable to care for them. On January 11, 2001, the trial court entered an order finding that the children were dependent and neglected. They were ordered to remain in foster care under the control of DCS.

On June 19, 2001, DCS filed its first petition to terminate the parental rights of both Mother and Father. At that time, Mother was pregnant with her son, B. M., who was born in November 2001. After a trial, the trial court denied the DCS petition to terminate and returned custody of the children to Mother on October 23, 2002. Therefore, at that time, Mother had custody of all four children.

Before long, in May 2003, the family once again came to the attention of DCS. DCS received reports that, on May 22, 2003, the children were left home alone, and the youngest child, then eighteen (18) months old, had run out of the home and into the street, nearly being struck by a passing car. When two of Mother's neighbors discovered the situation, they each took two of the children to their homes for the night and called DCS the next day. Upon investigation, DCS discovered that Mother had had two minor teenagers in her home the previous evening drinking alcohol. Mother had left the house with a male friend with a lengthy criminal history; her return was delayed because the friend was arrested for DUI. DCS also learned that Mother had hit her oldest daughter, A.B., in the eye, leaving a bruise, and had dragged her by the hair down the hall of the family's home. Based on the results of this investigation, DCS filed another petition, alleging that the children were dependent and neglected and seeking temporary custody. On May 30, 2003, the trial court issued a protective order placing the children in DCS custody. The children were moved into the foster home of Ms. Fran Coleman ("Coleman").

On July 1, 2003, the trial court held a preliminary hearing on the May 2003 dependency and neglect petition. On August 14, 2003, the trial court entered an order concluding that there was

probable cause to find that the children were dependent and neglected. The trial court returned the children back into Mother's custody, but held that they would remain within the protective jurisdiction of the trial court pending a further hearing. The trial court set out conditions for Mother to keep the children in her home, namely, that "the house remain clean; that [Mother] not use any corporal or assaultive punishment on the children; and that any babysitter of the children shall first be approved by [DCS]." Another hearing was scheduled for August 26, 2003.

The hearing was conducted as scheduled on August 26, 2003. On October 2, 2003, the trial court entered an order finding that the children were dependent and neglected and that Mother had not complied with the conditions set forth in the August 14, 2003 order. The order noted that Mother had left the children with babysitters who were not approved by DCS. The trial court also made the following findings regarding Mother's care of the children:

> [The children have] suffered from a pattern of prolonged neglect, specifically that the children were ill when initially removed from [Mother]; that they had sores on their heads; that they suffered from lice beyond what could be considered normal; that [Mother] failed to provide food and necessities for the children; that [Mother] failed to protect the children; and that [Mother] failed to supervise the children. The Court finds that [Mother] subjected the children to physical abuse and exposed them to domestic violence in her home.

Consequently, the trial court removed the children from Mother's custody and placed them back into foster care with Coleman. Mother was permitted to have supervised visitation with the children.

In September 2003, DCS entered into a permanency plan ("the Plan") with Mother for each of the children. The Permanency Plan had concurrent goals of returning the children to Mother and of adoption. Under the Plan, Mother was responsible for the following: (1) completing a psychological evaluation through the Center for Children and Parents and following any recommendation from the evaluation; (2) entering an intensive outpatient substance abuse program and following all recommendations of her treatment program; (3) refraining from abusing alcohol or illegal drugs or misusing prescription or over-the-counter medications; (4) arranging for transportation to her treatment program and counseling; (5) attending and participating in an intensive parenting program designed to address appropriate discipline, supervision, child development, hygiene, and cleanliness of her home; (6) providing DCS verification of successful completion of the parenting program; (7) demonstrating the parenting skills she had learned in the parenting program during visits with her children; (8) participating in counseling to address the development of personal relationships and to understand how her volatile relationships affect her children; (9) providing a clean, safe, and sanitary home environment and cooperating with homemaker services; and (10) signing the necessary releases to allow DCS to monitor the progress of her work with other providers. After a hearing on October 7, 2003, the trial court entered an order approving the Plan and stating that Mother "has been advised in open court of the possibility of termination of parental rights if she does not comply with all aspects of the plans within the time

allowed on the plans." The target date to achieve her goals was stated in the Plan as December 2003.

Mother participated in some of the programs and parenting classes contemplated by the Plan, but she did not complete any of them. Though she completed a psychological evaluation, she did not participate in the therapy recommended by the therapist. Mother completed an alcohol and drug assessment that did not recommend any further treatment for substance abuse issues. Because Mother had neither a vehicle nor a driver's license, transportation remained a consistent problem.

On May 21, 2004, DCS filed a second petition to terminate the parental rights of both Mother and Father. DCS alleged that Mother's parental rights should be terminated on the following grounds: (1) willful abandonment for willful failure to visit or engage in more than token visitation for four consecutive months immediately preceding the filing of the petition; (2) willful abandonment for willful failure to support or engage in more than token support for four consecutive months immediately preceding the filing of the petition; (3) failure to provide or make reasonable efforts to provide the children with a suitable home, and demonstrated lack of concern for the children to such a degree that it appears unlikely that she would be able to provide a suitable home for the children at an early date; (4) failure to remedy the persistent conditions which led to the removal of the children from the home and would prevent the children's safe return to Mother's custody; and (5) the likelihood that returning custody to Mother would cause substantial harm to the children. The trial court later determined that both Mother and Father were indigent and appointed separate counsel for each. The trial court also appointed a guardian ad litem for the children.

The trial court conducted a trial on the petition on September 7 and 14, 2004. Prior to the trial, counsel for Father announced that Father was consenting to the termination of his parental rights and would not contest the petition.[2] The hearing, then, focused on the termination of Mother's parental rights.

The DCS investigator who investigated the May 2003 episode, Cindy Curtis ("Curtis"), testified at trial. Curtis testified that, when DCS received reports that Mother's youngest child was nearly hit in the street by a passing vehicle, she visited Mother's home. Curtis said that she found that "Mother's home was just trashed." She said that clothes were strewn all over the bedroom, cigarettes were extinguished on the tables in the living room, and there were many dirty dishes in the kitchen. Curtis spoke with seven-year-old A.B., the oldest daughter, who told Curtis that Mother had hit her in the eye, giving her a "black eye," and had drug her down a hallway by her hair. A.B. told Curtis that Mother had told her to lie and say that she had rubbed her eye until it became bruised. Curtis also spoke with Mother, who admitted slapping A.B. on the shoulder, but denied causing the bruise on her eye. Mother told Curtis that she had started drinking at 2:00 p.m. the day of the incident, and had left the house with a male friend. She said that she had to walk home because the friend was later arrested for DUI. Curtis spoke with Mother's neighbors, who discovered that the children were unsupervised and decided to divide the children and bring them

_____

[2]Father's parental rights are not at issue in this appeal.

home. When Curtis arrived at Mother's home the next afternoon, minor teenagers who had been drinking alcohol in Mother's home the prior evening were still there. Mother told Curtis that her oldest daughter, A.B., was taking anti-depressants and that she had problems relating to having been molested by Mother's then-current boyfriend. Based on her investigation, Curtis found physical abuse and lack of supervision as to all four children. She found a substantial risk of harm with respect to the eighteen-month-old child, who was found in the street. At that point, Curtis stated, Mother had had a history with DCS, and her supervisor agreed with her recommendation that the children be removed from Mother's custody.

Curtis testified that DCS had provided Mother with family support services in order to work with Mother and to monitor the family. Case workers were provided to work with Mother on keeping the house cleaner, making better decisions regarding the children and their safety, and setting up drug assessments. The case manager, Curtis testified, set up any services that would benefit the family.

The children's foster mother, Coleman, also testified. She said that she had been working in child care for twenty-five (25) years, and that she had special training as a foster parent. Coleman testified that the children in this case had lived with her from May 23, 2003 until July 1, 2003, returned to her on August 26, 2003, and stayed with her until the date of the hearing. Coleman said that when the children first came to her home, "they were pitiful." She described them as sad and hungry, and said that their eyes were dark and hollow and all were sick and had diarrhea. Coleman said that "[t]he girls' hair was so thick with head lice, bugs crawling." The youngest child had bruises on his back just above his diaper, and one of the daughters had sores on her feet from wearing shoes that were too small and sores on her head that Coleman believed were from the lice. All of the children were treated for pinworms, and the youngest child had his shots updated. There was some concern that two of the girls had been sexually abused, because they requested a cold rag to hold against their private parts. A.B. and T.B. were on sleep medication, and T.B. was also taking medicine for attention deficit disorder. When the children would play house, Coleman observed, the children would pretend that there were people in the house who were drunk or with drugs, and they would discuss not being able to live with someone because the person was so drunk. The girls also pretended that they were going out on dates and would say that they were going to spend the night with their boyfriend. The children were terrified of sirens, and when they heard sirens, they asked Coleman if she had done anything to cause the police to come get her. Coleman assured the children that she had not, and that the sirens meant that the police were doing their job.

Coleman noticed that the children had nightmares after they had visits with their parents. T.B. became upset when she was told that she was scheduled to visit with Mother. On one occasion, when she was scheduled to visit Mother, T.B. complained that she felt sick, but then suddenly felt better when she was told that Mother would not be able to visit. In July 2003, when the children were sent back to Mother's home, "they didn't want to even carry their clothes with them; they knew they would be back." When the children returned to Coleman's home on August 26, 2003, after they had been with Mother a few weeks, they again had head lice, A.B. had strep throat, and all of the children were "in much the same condition they came in the first time."

Coleman noted that, by the time of trial, all of the children were no longer taking medications, except that T.B. continued to take medication for her attention deficit disorder. Though the youngest child was not in school, the daughters were in preschool, first grade, and second grade, respectively, at the time of trial. A.B. and T.B. had struggled the previous school year, but by the time of trial, they were both doing well in school. When Coleman told the children about the prospect of being adopted by a family, she said, they were all excited. Coleman testified that she did not intend to adopt the children if Mother's parental rights were terminated, but said that she would be willing to keep the children in her home so long as she was needed to help the children find an adoptive home. Coleman noted that DCS did not discuss with her the termination of Mother's parental rights until a few weeks before trial.

The trial court also heard testimony from Tracy Connell ("Connell"), the case manager at Pathways, a counseling facility, for the three oldest children involved in this case. Connell was initially assigned to T.B.'s case in March 2003 to address the behavior and educational problems stemming from her attention deficit disorder. Connell said that she had been visiting T.B. at school two or three times a month as needed. Compared to how she was when she lived with Mother, Connell said, T.B. showed great improvement in school. At the time of trial, there were no behavioral or educational complaints about T.B. from teachers, and T.B. had become very open, smiled a lot, and played well with others, in contrast to her demeanor when she lived with Mother. Connell said that, at times, she worked with Mother to teach her parenting skills or methods for coping with issues that would arise. She noted that Mother consistently yelled and was negative about the child's behavior.

Beginning in April 2003, Connell also treated A.B., the oldest daughter. Mother sought counseling for A.B. because she had become sad and quiet and was not sleeping well. Connell also visited with A.B. two or three times a month, and by the time of trial she was doing much better. Although A.B. was put on anti-depression medication when Connell first began to visit her, by the trial, she had stopped taking the medication. Connell said that A.B. now seemed positive about the future, had become a leader, and wanted to become a teacher.

In September 2003, Connell began seeing the youngest daughter, E.B, when she was four years old. Connell began seeing E.B. because she had been placed into individual counseling when she came into the custody of DCS. Initially, Connell said, E.B. was clingy, quiet, and not secure in her environment. By the time of trial, she was very open and verbal about her feelings. E.B. was not on any medication at the time of trial. Connell attributed the positive changes in all of the children to the change in caretakers.

Connell conceded that she had commented to another case worker on January 21, 2004, that she was afraid that Mother would "pull it together in February." When asked about her comment, Connell said that it related to Mother's alcohol and drug assessment. She said that she in no way inhibited Mother from getting her children back.

The trial court heard testimony as well from Molly Veazey ("Veazey"), a program manager at Pathways who worked with Mother. Veazey's first visit with Mother was in October 2003, as ordered under the Permanency Plan, to set up a psychological evaluation, individual counseling, and an alcohol and drug assessment. Between October 2003 and July 29, 2004, Mother visited Veazey five times, out of thirteen scheduled visits.[3] On several occasions, Mother told Veazey that she had missed her appointment because of transportation issues, even though Veazey had informed Mother that she could receive free transportation through TennCare. During the five visits, Veazey and Mother worked on the requirements of Mother's Permanency Plan, such as getting a job, paying legal fines, meeting with the children, and the like. On numerous occasions, Mother verbalized to Veazey her desire to have her children returned to her.

Mother underwent a psychological evaluation. She was diagnosed with bipolar disorder and was prescribed medication for it. Another therapist performed the alcohol and drug assessment on Mother and concluded that Mother did not need alcohol and drug services. However, at every visit with Veazey, Mother denied using drugs or alcohol. Veazey said that at times Mother would make progress, then at other times would regress. "[I]t was just kind of back and forth." At the last two visits Mother seemed more committed to trying to get the children back than she had seemed in the first visits. Veazey had not released Mother from her care, but understood that Mother missed her last appointment because she was incarcerated.

Another witness at trial was Patricia Roberson ("Roberson"), who had supervised Mother's visits with the children since June 2003. She said that, during the four months preceding the filing of the termination petition (January 21, 2004 through May 21, 2004), Mother visited the children eleven (11) out of about seventeen (17) scheduled visits. Between June 11, 2003, and May 21, 2004, Roberson said, Mother attended twenty-four (24) of thirty-nine (39) visits. When she missed visits, Mother frequently cited transportation difficulties as the reason. During the visits, Roberson observed, Mother and the children were affectionate. The oldest daughter, A.B., was particularly interactive with Mother, and Mother was especially interactive and loving with the youngest child, her son. Roberson talked with Mother and showed her some disciplinary techniques, though Mother generally did not understand the techniques and overall showed a lack of ability to discipline during the visits. Roberson felt that Mother was unable to manage all four children at once, because she frequently would become fixated on one and ignore the others. The children did not seem disappointed when Mother failed to show up for a visit, because Connell always had a plan in place in case the visit did not happen, such as taking the children to the library or out for a special treat.

Mother called Leah Dotson ("Dotson") to testify on her behalf. Dotson was the foster mother for the three oldest children from June 2001 through July 2002 when the children were returned to Mother.[4] Dotson and her husband had the children in their care for about a year, and they visited the

---

[3] Mother had one visit with a different Pathways therapist because Veazey was out with an illness.

[4] Dotson is a teacher. She has a master's degree in education and a bachelor's degree in English.

children often after they returned home to Mother.[5]  Dotson felt that the children had an attachment to Mother and that they cared about and loved her.  Dotson was in Mother's house two or three days prior to the May 2003 episode and noted at that time that it not unsafe and it "was messier than usual, but it wasn't horrible."  She said that, although the house was usually messy, it was clean — "the floors were clean; the dishes were done; the . . . bathroom was clean."  There was food in the refrigerator and in the cabinets.  When Dotson visited the home after the children were returned to Mother in July 2003, Dotson noted that Mother was keeping the house clean and was being more strict with the children and keeping the kitchen stocked with food.  She said that there were no unsafe conditions, and that she never observed the children running wild in the neighborhood.

Dotson said that she thought Mother was receiving welfare benefits and housing when she had the children, but that Mother had little other family resources.  She was aware that Mother did not have a driver's license or an automobile.  Mother's level of education was less than high school, but she was interested in improving her education and her situation in life.

On cross examination, Dotson admitted that she saw that the children had head lice.  Dotson felt that the sores on E.B.'s head were not from the lice.  She said that she never saw bruising on any of the children.

DCS presented testimony from Terri Prater ("Prater"), the DCS case manager assigned to this case in 1999.  Prater had remained on the case throughout these proceedings.[6]  Her job was to visit the children, to make sure they had visitation with the family, and to see that they received medical and dental check-ups, counseling if needed, satisfactory school conditions, and other necessities.  Prater noted that the children were removed from Mother's home in 1999 because of alcohol abuse and neglect, and were again removed in May 2003 for alcohol abuse, lack of supervision, and neglect.  Mother had been living in public housing, but was incarcerated in the county jail at the time of the hearing.  Prater was unsure where Mother would live after she was released.

Prater testified that, during the year prior to the trial, A.B., the oldest daughter, had progressed well.  She was excited about school and excelled at her school work, became talkative, discussed being a teacher, and was excited to be with her brother and sisters.  Earlier, she had been medicated for symptoms of depression and difficulty sleeping.  After she was removed from Mother's custody, she was taken off all medication and became "as normal as a little girl . . . could be."  Prater observed that the second oldest daughter, T.B., also showed great improvement after being removed from Mother's custody.  Prater said that, although T.B. had experienced difficulty reading, she improved her reading by attending an after-school tutoring program and working with her foster parents.  In addition, Prater testified, the third child, E.B., had also made considerable

---

[5]At some point, allegations of abuse arose against Dotson relating to another foster child.  Therefore, DCS closed Dotson's home as a foster home.  Dotson said she was not in a position to challenge the allegations because, soon thereafter, her home was destroyed by a tornado.

[6]from December 10, 2003 through March 22, 2004,  Prater was replaced by Patsy Crockett for about sixteen weeks while Prater was on maternity leave.

progress during the year prior to trial.  Prater described E.B. as talkative and affectionate.  Prater said that the youngest child, B.M., the son who was almost three years old at the time of trial, was also doing well, playing and interacting with his siblings.

Prater testified about the efforts made by DCS toward reunification of Mother and the children.  She said that Mother was provided with counseling and parenting services, and the children were also provided counseling.  In July 2002, DCS purchased for Mother bunk beds, linens, dressers, and made a housing deposit for her in order to facilitate the return of the children.  Prater commented that DCS  "paid for everything."  When the children were returned to Mother's home in July 2003, Prater said, social services was brought in to talk with Mother about parenting issues and any other issues that needed to be addressed in the home.  In order to facilitate visitation, DCS conducted home studies on other relatives, facilitated therapeutic visitation to supervise the visits among Mother, Father, and the children, and provided counseling though Carey Counseling and through Pathways.  Mother received financial assistance through Tenn-Care, AFDC, the Families First program, and food stamps.  Prater emphasized that DCS had "worked with [Mother] the whole life of this case.  We have worked out locations for visits, all in accordance with school and counseling  and appointments . . . ."  Regarding transportation, Prater said that Mother had been informed that she could call a toll free TennCare number to get rides to her appointments and visitation sessions.  Prater admitted, however, that, in a meeting with Mother on September 10, 2003, she told Mother that she would be responsible for paying for the services required under the Plan, because DCS had paid all they were going to pay on her case, that Mother "was totally on her own."

Prater said that Mother brought the children snacks to her visits and sent them cards, but that she sent no support.  Although Prater talked to Mother about how to find a job, in order to be financially responsible for the children, Mother had made no effort to do so. Prater noted that, at some point, Mother was put in jail for contempt for failing to pay support for the children.  Prater commented that Mother had been in and out of jail during the entire time in which her children were in DCS custody.

Prater testified that she was very concerned that reuniting Mother with the children would again result in the older two children becoming quiet and afraid to discuss what was happening at home.  "They will have to once again become adults and take care of each other."  Prater said that Mother has "very little" ability  to parent her children.  She recounted an incident during a visit to a playground, in which Mother focused on one or two of the older children but had no awareness of the youngest child, who wandered to a place where he could have gotten out of the playground.

Prater conceded that Mother had completed several of the requirements under the Plan, but maintained that nothing Mother had done had produced results.  She noted that Mother was homeless, was back in jail, was inconsistent in keeping her counseling appointments, and was unable to demonstrate in her visits with the children any of the parenting skills she was taught during counseling.  Prater agreed that Mother had made an attempt to complete the Plan, but would not characterize Mother's efforts as "reasonable."  Prater testified that she had emphasized to Mother the importance of *completing* the Plan in order to maintain her parental rights.

Prater testified that since Mother had not made the improvements necessary to reunite her with the children, she asked that the trial court terminate Mother's parental rights, in order to allow the children to be placed with a "forever family." She said that the children were aware of that possibility, and that they wanted to be placed with a permanent family.

Mother testified on her own behalf. At the time of trial, she was incarcerated at the Carroll County Jail for violating the terms of her probation by failing to pay fines and court costs. She anticipated being released on or before August 5, 2005. Mother admitted that she had paid no support for the children, and that she had previously been incarcerated in Weakley County for fifteen days for her failure to make child support payments. She also spent two days in jail in Henry County on another minor charge. Mother conceded further that, not long before the trial, she was arrested on a charge of selling Hydrocodone. Mother said that she had lived in public housing for two years and, prior to that, she lived with her sister. She planned to once again live with her sister and brother-in-law when she was released from jail, and she testified that she and her children could live with them until she found another place to live.

Mother explained that she had missed her counseling appointments because she lacked transportation. She admitted that she received State assistance, and that she was able to use TennCare transportation. When asked what further services DCS could have provided her to help her regain custody of her children, Mother responded, "Well, they have helped me." She later testified, however, that DCS never paid for an alcohol and drug assessment or counseling, nor did they provide her transportation to her visits with the children or offer to help her obtain the vocational skills that she needed to become employed. She noted that in her meeting with Prater on September 10, 2003, Prater told her that she was "on her own" and that DCS would no longer pay for any services required under the Plan. Mother claimed that she had tried to look for a job, but her opportunities were limited. She said that, in any event, if she took a job, it would prevent her from being able to visit her children and attend counseling.

When asked about her counseling sessions, Mother admitted that she had "slacked off some" in attending them. She testified that she visited the children "off and on," but said that lack of transportation kept her from keeping her visitation appointments. Mother said that her only income was TennCare and food stamps, and admitted that she was actually in a worse situation at the time of trial than she was in 1999 when the children were first removed from her custody. She acknowledged that her children were doing well in foster care.

When asked why she wanted to maintain her parental rights, Mother stated that she loved her children and claimed that if she had her children back, she would "get on the right track." She allowed that she might have to move away because she had been hanging around a "[b]ad crowd," one "that drinks alcohol and parties." When asked what had changed since the children were removed from her custody that would justify maintaining her parental rights, Mother admitted that nothing had changed. She was adamant, however, that she loved her kids and, if given another chance, she would get a job to support them.

At the conclusion of the hearing, the trial court held that clear and convincing evidence established grounds for termination. The grounds the trial court held had been established were abandonment for failure to support,[7] failure to comply with the Permanency Plan, and "persistent conditions," that is, that the conditions which led to the children's removal from Mother's home were not likely to be remedied so that the children could safely return. The trial court concluded that the best interest of the children would be served by terminating Mother's parental rights. On October 26, 2004, the trial court entered an order consistent with its oral ruling. From that order, Mother now appeals.

On appeal, Mother argues that the trial court erred in finding that clear and convincing evidence established grounds for termination and that terminating her parental rights was in the best interest of the children. She argues that the evidence at trial showed that, when the children were in her care, she accepted in-home services and that she was working to resolve the conditions that led to the children's removal. She claims that DCS did not make reasonable efforts to return the children to her home, and that DCS attempted to make the Plan difficult for her to complete and took steps to intentionally doom her to failure. Mother asserts that Prater's testimony established that she substantially complied with the Plan, and that she attempted to complete the Plan to the best of her ability. In addition, Mother argues that the evidence did not show that her failure to support the children during the four months preceding the petition for termination was willful, because she was financially unable to pay support at the time, and the Plan did not require her to pay support. Finally, Mother argues that the trial court erred in determining that termination of her rights was in the children's best interest and awarding her legal and physical custody would pose a risk of substantial harm to the children.

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972); *Kilpatrick v. Brown (In re Drinnon)*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). A parent's right to the care and custody of their child "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tennessee Code Annotated § 36-1-113(l)(1)). A decree terminating a parent's rights "obliterates the parent-child relationship and, in the eyes of the law, relegates a biological parent to the role of a complete stranger to his or her child . . . ." *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004). Consequently, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

---

[7]The trial court found that the evidence was not sufficient to establish abandonment based on Mother's failure to visit the children. This finding is not at issue on appeal.

With those principles in mind, we look to Tennessee Code Annotated § 36-1-113(c), which sets out the framework for the burden of proof in a termination of parental rights case. That statute provides:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

T.C.A. § 36-1-113(c) (Supp. 2004). Thus, the petitioner must first prove one of the statutory grounds for termination, enumerated in Tennessee Code Annotated § 36-1-113(g), and then must prove that terminating the biological parent's rights is in the child's best interest, considering the factors listed in Tennessee Code Annotated § 36-1-113(i).[8]   *See* T.C.A. § 36-1-

---

[8]The factors to be considered in determining whether termination of parental or guardianship rights is in the best interest of the child are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(continued...)

113(c)(1), (2) (Supp. 2004). Because of the importance of the constitutional interests involved, the statute requires that both the grounds for termination and the best interest of the child be proven by clear and convincing evidence. T.C.A. § 36-1-113(c)(1) (Supp. 2004); *see State v. Calabretta (In re J.J.C.)*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004); *In re M.J.B.*, 140 S.W.3d at 653. The "clear and convincing" evidence standard is a heightened standard of proof, which is more exacting than the "preponderance of the evidence" standard, yet does not require the certainty of the "beyond a reasonable doubt" standard. *Means*, 130 S.W.3d at 54-55. It "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *Calabretta*, 148 S.W.3d at 925 (quoting *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn Ct. App. 1995)).

In light of the heightened "clear and convincing" standard of proof required at the trial court level, an appellate court's standard of review is modified:

> Because of the heightened burden of proof required by T.C.A. § 36-1-113(c)(1), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact *de novo* in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights.

*In re M.J.B.*, 140 S.W.3d at 654 (citing cases). Thus, we presume the trial court's findings to be correct, unless the evidence preponderates otherwise. We then determine whether those facts, "either as found by the trial court or as supported by the preponderance of the evidence," show by clear and convincing evidence that Mother's rights should have been terminated. *Id.* There is no rote formula; each case must be resolved based on "individualized decision making." *Tennessee Baptist Children's Homes, Inc. v. Swanson (In re Swanson)*, 2 S.W.3d 180, 188 (Tenn. 1999).

We first address Mother's argument that the trial court erred in finding that clear and convincing evidence established "persistent conditions" as a ground for termination of her parental rights. The relevant portion of the statute provides that parental rights may be terminated when the proof establishes that:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

---

[8](...continued)
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5- 101.

T.C.A. § 36-1-113(i) (Supp. 2004).

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn Code Ann. § 36-1-113(g)(3)(A) (Supp. 2004).

In this case, the trial court noted that, between August 1999 and May 2003, four court orders were entered finding that the children were dependent and neglected. At the time of the fourth order, the trial court noted, Mother was abusing alcohol, had teenagers drinking at her house, allowed the youngest child to wander into the street and nearly be hit by a car, and physically abused her oldest daughter and tried to get her to lie about how her injury occurred. Thus, the trial court concluded, since 1999, the conditions that had persisted were "alcohol abuse, failure to supervise, failure to maintain a clean and sanitary home, physical abuse, failure to care for the children in a sanitary manner, lack of employment, lack of stability and failure to adhere to the law and the rules of probation and stay out of jail." The trial court observed that Mother continued to abuse alcohol, and that she had never obtained the results from her alcohol and drug assessment. The trial court credited Roberson's testimony that Mother was unable to discipline and manage the children. It further noted that "every time [the children] have been removed from [Mother's] home they have had head lice," and surmised that this was caused by Mother's failure to maintain a sanitary home. The trial court emphasized Mother's complete failure to make any effort to obtain employment and her refusal to adhere to the law as a condition that has persisted throughout the years prior to trial. The trial court commented, "Not only is she in jail right now [for violating her probation]; she's been charged in another count with sales of Schedule III controlled substance. While I realize that she is presumed innocent until found guilty, she continues to rack up charges." Based on these factors, the trial court concluded that the conditions which led to the children's removal had persisted for more than six (6) months, that these conditions would cause the children to be subjected to further neglect or abuse if they were returned to Mother's care, and that it was unlikely that the conditions would be remedied at an early date. Furthermore, the trial court found that continuation of the parent-child relationship greatly diminished the chances for the children's early integration into a safe, stable, permanent home.

Mother argues that the allegations of persistent conditions were rebutted by the testimony at trial. Mother points out that, during the period between July 1, 2003 and August 26, 2003 when the children were returned to DCS custody, there were no other incidents in Mother's home similar to the incident on May 22, 2003, that resulted in the removal of the children. In fact, Mother argues,

-14-

during that time, she accepted in-home services and was working to resolve the concerns that led to the removal of the children. She notes that she attended parenting classes, received counseling, and underwent psychiatric evaluation and alcohol and drug assessments, all of which were directed at rectifying the conditions that led to the children's removal from the home. She also began taking medication for her bipolar disorder and was described by her counselor as "very cooperative." Therefore, Mother argues, the evidence establishes that the conditions which led to the children's removal did not persist.

We disagree. As the trial court noted, between August 1999 and May 2003, several orders were entered finding the children to be dependent and neglected because of Mother's alcohol abuse, failure to provide the children with a safe and clean home, failure to support the children or obtain employment to enable her to support the children, and overall neglect of the children's basic needs. The evidence shows that Mother only paid lip service to completing the requirements in the Permanency Plan. While she attended some parenting classes and counseling sessions and obtained the required assessments and evaluations, she made no real progress on any front. At the time of trial she remained unemployed, homeless, in and out of jail, prone to substance abuse and without adequate parenting skills. Moreover, Mother admitted in her testimony that she was actually in a worse situation than she had been when the children were first removed. The trial court rightly rejected her protestations that DCS did not make reasonable efforts to provide services to enable the children to return to Mother's home, as well as her assurances that she would get a job and "get on the right track" if the children were returned to her. Clearly, it is highly unlikely that Mother's situation will be remedied at an early date. Under these circumstances, we affirm the trial court's conclusion that DCS has established by clear and convincing evidence the ground of persistent conditions for termination of Mother's parental rights. Because only one ground for termination need be established under the statute, we need not address whether the trial court erred in concluding that Mother's rights should be terminated based on abandonment or on Mother's failure to substantially comply with the Plan. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. Ct. App. 2003).

We must next determine whether clear and convincing evidence establishes that termination of Mother's parental rights was in the children's best interest. After considering the factors enumerated in Tennessee Code Annotated § 36-1-113(i), the trial court concluded, "[T]here's no question in this in this [sic] Court's mind that termination is the only way to get these children into a stable and consistent home, good home." We agree. While the children were living with Mother, they were unclean, unsupervised, their basic needs were not met, and they were depressed to the point of requiring medication. As noted above, the conditions in Mother's home which brought them to that point still exist. In foster care, the children have flourished, and the evidence shows that contacts with Mother have had a destabilizing effect on them. Under all of these circumstances, there is clear and convincing evidence that termination of Mother's parental rights is in the children's best interest, and the trial court's decision to terminate her rights must be affirmed.

The decision of the trial court is affirmed.  Costs on appeal are to be taxed to Appellant Belinda Medlin, and her surety, for which execution may issue, if necessary.

_____

HOLLY M. KIRBY, JUDGE