IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
OCTOBER 11, 2007 Session

## IN THE MATTER OF M. L. P.

**Direct Appeal from the Juvenile Court for Shelby County**
**No. P9221     Herbert Lane, Special Judge**

---

**No. W2007-01278-COA-R3-PT - Filed April 8, 2008**

---

This appeal involves a petition to terminate a father's parental rights that was filed by the child's great aunt, great uncle, and another couple who would like to adopt the child. The juvenile court dismissed the petition upon finding that the father did not willfully abandon the child. The court found that the great aunt and uncle had interfered with the father's attempts to visit the child. The petitioners appeal. We reverse and remand for further proceedings.

**Tenn. R. App. 3; Appeal as of Right; Judgment of the Juvenile Court Reversed and Remanded**

ALAN E. HIGHERS, P. J., W. S.,  delivered the opinion of the court, in which DAVID R. FARMER, J., joined, and HOLLY M. KIRBY, J., dissented.

Kevin W. Weaver, Cordova, TN; James F. Arthur, III, Memphis, TN, for Appellants

Arthur C. Walton, Memphis, TN, for Appellee

Robert E. Cooper, Jr., Attorney General and Reporter, Amy T. McConnell, Assistant Attorney General, Nashville, TN, in support of Tenn. Code Ann. §37-2-403

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Marcus Grimes Pritchett ("Father") and Alexander Lenora Pugh[1] ("Mother") met and began dating in high school in Memphis, Tennessee, when they were approximately fifteen years old. When Mother was a senior in high school, she began living with Father in his father's home. Father and Mother had a son ("M.L.P.") on July 7, 2001, when they were both twenty years old. Father and Mother were never married, and no one was listed as M.L.P.'s father on his birth certificate.

Father, Mother, and M.L.P. lived with Mother's mother, Connie Duvall ("Grandmother"), until M.L.P. was about four months old. Father worked during that time, and Mother and Grandmother did not work. However, according to Grandmother, she had to financially support the entire household. Grandmother's sister, Brenda Herring ("Great Aunt"), also contributed financially to M.L.P's care.

In November of 2001, Father, Mother, and M.L.P. moved into a rental house. Father worked, and Mother did not. Mother applied for and received welfare payments on account of M.L.P.Grandmother continued to care for M.L.P. whenever Mother needed her assistance. Father and Mother had a second child in February of 2002, but sadly, he never left the hospital and died at six weeks old. During those six weeks, M.L.P. regularly stayed with Grandmother or Great Aunt. Father, Mother, and M.L.P. later moved into a town home, where they lived until approximately January of 2003, when Father and Mother were evicted for failure to pay rent.

After the eviction, Mother left Father, took M.L.P., and moved back in with Grandmother. M.L.P. was about eighteen months old. By all accounts, the relationship between Mother and Father had always been "rocky." According to Grandmother, Mother and Father were always fighting, and Father did not help Mother to care for M.L.P. Mother and M.L.P. lived with Grandmother for about two months, and Father did not call, visit, or send money to help support M.L.P. during that time. Then, in March of 2003, Mother told Grandmother that she wanted to move back in with Father, and she asked if M.L.P. could keep living with Grandmother. Grandmother agreed to keep M.L.P., and Mother left.

Later in March of 2003, Grandmother and M.L.P. moved to Mountain Home, Arkansas.Mother came to visit them in July of 2003, and she took M.L.P. back to Memphis with her. After about ten days, Grandmother went to visit them in Memphis. According to Grandmother, the house where Father, Mother, and M.L.P. lived was nasty, M.L.P. was dirty, and she suspected that Mother was using drugs. Grandmother immediately asked if she could take M.L.P. back to her home. Mother agreed, and Father did not object. Grandmother and M.L.P. returned to Mountain Home, Arkansas, where they lived for several more months. M.L.P. turned two years old during this time. According to Grandmother, M.L.P. had never received many of his required immunizations,

[1] Mother is also known as Alexander Louise Pugh and Alexander Louise Espino.

and she had to take him on several occasions to get several injections in order to get him "caught up." During the eight months that Grandmother and M.L.P. lived in Mountain Home, Father never called about M.L.P., never visited him there, and never sent any financial support or gifts for M.L.P. Mother had called a couple of times, and one time she sent Grandmother $55.00 when Grandmother told her that she "could use some money."

Around November of 2003, Grandmother and M.L.P. moved back to Memphis. Mother told Grandmother that she was ready to take on the responsibility of caring for M.L.P., and so M.L.P. went back to live with Mother and Father. When Mother and Father were working, M.L.P. apparently would stay with either Father's father, Grandmother, or Great Aunt. In January of 2004, Great Aunt began regularly caring for M.L.P. during the day. According to Grandmother, Mother's behavior soon "took a turn for the worse," as Mother began to neglect caring for M.L.P. Grandmother explained that M.L.P. became very fearful of being left alone. Grandmother advised Father to "cut your losses" and leave Mother.

On January 31, 2004, Mother called Great Aunt and told her that she planned to leave Father. Mother asked if Great Aunt would keep M.L.P. while Mother looked for a house and a new job. Great Aunt agreed, and on February 1, 2004, M.L.P. went to live with Great Aunt. The day that Mother left Father would be the last time that Father saw M.L.P.

Mother did not contact Great Aunt again for three weeks, when she called and told Great Aunt that she was "really messed up," taking drugs, and had no money. Father, however, began calling Great Aunt in early February, asking if he could come to her house to see M.L.P. According to Father, he did not know that Mother was leaving him or taking M.L.P. until he got off work one day and learned that Mother did not take M.L.P. to Father's father's house that morning as planned.[2] Father stated that he did not know where M.L.P. was living for a while, but that he contacted Great Aunt when he learned M.L.P.'s whereabouts. It is undisputed that Father called Great Aunt several times in February asking if he could come to Great Aunt's house to see M.L.P. According to Great Aunt, she told Father each time, "I don't think it's a good idea right now." Great Aunt explained that she said this because M.L.P. was so traumatized when he came to live with her that she had to let him sleep with her for three months, and that he would scream whenever she was out of his sight. According to Father, Great Aunt told him that he could not see M.L.P. because she thought that it was not in M.L.P.'s best interest. Father stated that out of the six to eight times that he called in February, Great Aunt allowed Father to speak to M.L.P. on the phone twice. It is undisputed that Father told Great Aunt that he would take her to court, to which Great Aunt responded, "please do." Father contacted Great Aunt only one time after February, when he called to discuss his relationship with Mother.

_____

[2] According to Father, Mother left him and took M.L.P. not long after Christmas in 2003. He also testified that he had lived with Mother and M.L.P. for at least six months when she left him, which would mean that Grandmother and M.L.P. had moved back to Memphis prior to November of 2003. When asked to clarify the discrepancy in the dates, Father could not say when Grandmother and M.L.P. returned from Mountain Home, he only said that "[i]t wasn't in November because we were in that house I know a good three months." Father then said, "[y]ou might want to ask [Grandmother] that question because she probably didn't have him from that period of time that she said she did."

Father subsequently signed a voluntary acknowledgment of paternity recognizing him as M.L.P.'s father. On May 4, 2004, a new birth certificate was issued that listed Father as M.L.P.'s father.

On May 7, 2004, which was the Friday before Mother's Day weekend, Mother showed up at Great Aunt's house unannounced with two other people that Great Aunt did not know. Mother had not spoken with Great Aunt since her telephone call when she explained that she was "messed up." Great Aunt and M.L.P. were outside when Mother arrived, and M.L.P. ran to Mother. Great Aunt claims that she hardly recognized Mother because Mother had lost a tremendous amount of weight. Mother mentioned taking M.L.P. with her, and Great Aunt said that he could not go because they were about to leave to go somewhere. When Mother mentioned leaving with him again, Great Aunt reached over and grabbed M.L.P. away from Mother, then turned to go inside. Mother tried to follow her, and Great Aunt called the police. Father knew that Mother was going to pick up M.L.P., and he arrived at Great Aunt's house after their confrontation. When the police arrived, Grandmother conceded that she did not have legal custody of M.L.P., but she told the police that Mother was on drugs. The police discovered that there was an outstanding warrant for Mother's arrest, and they took her to jail. Great Aunt took M.L.P. and left town for the weekend.

On the following Monday, May 10, 2004, Father and Mother, as well as Grandmother, Great Aunt and her husband, Terry Lane Herring ("Great Uncle"), all went to the juvenile court of Shelby County and discussed their situation with social workers. Great Aunt and Great Uncle filed a petition alleging that M.L.P. was dependent and neglected, specifically stating:

> . . . mother is a substance abuser and has been involved in abusive relationships and the child has witnessed said abuse. The child has resided in the home of your petitioner since February 1, 2004, the mother did not visit until the 7th of May, 2004. Your petitioners fear for the safety of the child due to the times that child has been abandoned for extended periods of time.

The petition named Father and Mother as M.L.P.'s parents, and it listed the same address for both of them. The juvenile court issued a protective custody order placing temporary custody of M.L.P. with Great Aunt and Uncle. Father and Mother were at the juvenile court that day, but Father did not institute a proceeding or take any action to assert his right to custody of M.L.P.

On May 12, 2004, Juvenile Court Referee Herbert Lane held a preliminary hearing on the petition, but Father did not attend the hearing. Father later explained that he did not attend the hearing because he "wasn't supposed to" and "wasn't even told to." The referee recommended that temporary custody and guardianship of M.L.P. be granted to Great Aunt and Uncle, and that Mother be ordered to complete drug counseling. The juvenile court judge confirmed the recommendations of the referee.

On July 16, 2004, there was another hearing on the matter. Father testified briefly, but he did not assert any right or claim to custody of M.L.P. or seek any other type of relief. Father left during the court's noon recess and did not return for the afternoon proceedings. Father later explained that he left because, when he arrived at court, he learned for the first time that Mother had married someone else. At the conclusion of the hearing, the court ordered that temporary custody remain with Great Aunt and Uncle pending further orders, but it awarded Mother liberal visitation privileges. Mother was also ordered to continue with drug counseling and to maintain stable housing.

The case was continued for periodic review, and during the course of subsequent proceedings, Mother failed a drug test and apparently refused to take another one. Father never attended another hearing or otherwise participated in the proceedings. On March 30, 2005, the juvenile court found that M.L.P. was dependent and neglected for the reasons set forth in the original petition. Custody and guardianship of M.L.P. was awarded "by default" to Great Aunt and Uncle. Great Aunt "made it known" that there were outstanding warrants for Mother's arrest, and she was arrested in the parking lot following the hearing.

On August 16, 2005, Great Aunt and Uncle, along with Michael and Connie Clarkson, petitioned the juvenile court to terminate the parental rights of Mother and Father. The Clarksons are friends of Great Aunt and Uncle who desire to adopt M.L.P. The petition alleged that neither Mother nor Father had visited, communicated with, or contributed to the financial support of M.L.P. for more than four months preceding the filing of the petition, constituting abandonment pursuant to Tennessee Code Annotated section 36-1-113(g)(1). They also alleged that the parents' rights should be terminated pursuant to section 36-1-113(g)(3)(A) because conditions that led to M.L.P.'s removal from their home had persisted. The petitioners contended that termination of parental rights was in the best interest of M.L.P.

The juvenile court appointed a guardian ad litem and set the matter for hearing. Mother failed to appear at a hearing, and the petitioners moved for default judgment against her. Mother then voluntarily surrendered her parental rights to M.L.P. to the Clarksons as prospective adoptive parents.

On April 26, 2007, Special Judge Herbert Lane held a bench trial on the petition to terminate Father's parental rights. M.L.P. was then five years old. Grandmother testified about the care she had provided for M.L.P. She stated that Father only gave her $50.00 on one occasion when they all lived together, but she had never asked him for money or items besides that one time. Grandmother also described the periods of several months when she had cared for M.L.P., and Father had never called or visited. Grandmother stated that Father never objected to her keeping M.L.P. and never asked her to bring M.L.P. back to him. Grandmother clearly blamed Father for Mother's involvement in drugs and violence.

Great Aunt testified about the phone calls Father made during February of 2004 when he asked to visit M.L.P., and why she told him that she thought he should not visit. She testified that

Father called "at the most" three times. She also stated that Father did not make any effort to see M.L.P. during the dependency and neglect proceedings, which had lasted from May 10, 2004, to March 30, 2005. Great Aunt further testified that she had never received any money from Father, and that Father had never sent any type of present or birthday card to M.L.P. since he had lived with her.

Mr. Clarkson testified that he and his wife wished to adopt M.L.P. if Father's parental rights were terminated. He testified that M.L.P. currently spends the night with his family about once per week, and that M.L.P. also spends holidays with his family. Mr. Clarkson further explained that he had never spoken to Father, and that he was not aware of any recent contact between Father and M.L.P.

Mother testified that Father had always indicated to her that he would like to have custody of M.L.P., and that Father had always wanted to take care of M.L.P. However, Mother stated that she always let her family interfere, and she chose them over Father because they disapproved of Father. Mother said that her family had always overpowered her decisions. Mother acknowledged that she previously had problems with "crystal meth," but she testified that Father was not involved with her drug problem.

Father testified that the last time he had seen M.L.P. was when Mother left with him sometime after Christmas of 2003. He described his telephone calls to Great Aunt in February of 2004, when she told him it was not a good idea to visit M.L.P. Father stated that he felt Great Aunt actively prevented him from seeing M.L.P. Father acknowledged that he threatened to take Great Aunt to court, but when asked if he ever took Great Aunt to court, Father replied:

> No, sir. There were steps to be taken to where I could even go to court. I was not on the birth certificate. I had to make – that was my first step, and I did that. And then financial reasons, I got that. I met my financial reasons, and that's why I'm here now.

He explained that he voluntarily acknowledged paternity of M.L.P. when he realized he "had no say so" in what was going on. Father said that "if I was on the birth certificate, I would have went and picked my child up from [Great Aunt's] house and there would have been nothing that could have stopped me."

Father testified that he knew Mother was going to pick up M.L.P. from Great Aunt's house on May 7, 2004, and that he had told her, "you are the mother of [the] child, they cannot stop you from getting your child."

Father was asked about the events of May 10, 2004, when Great Aunt and Uncle filed the dependency and neglect petition and were awarded temporary custody of M.L.P., and Father was also at juvenile court but did not take any action to seek custody or visitation. Father conceded that he knew there would be a judicial determination regarding "what happened to" M.L.P. When asked

why he did not take action to enforce his rights, Father said, "I was the voice of reasoning to get [Mother] to come down here . . . I told her what she can do." He then clarified that he told Mother "[t]hat she is legally the mother of that child and there's no one that can stop her, by law, from taking that child back from her aunt." Father said that he did not consider himself to be the legal father of M.L.P. at that time, even though he had acknowledged paternity. When asked why not, he said, "I don't have an answer for that."

Father was then asked about his only appearance during the dependency and neglect action, when he testified at a hearing during the morning proceedings but left during the noon recess. Father stated that he was subpoenaed to come to court that day, and he described his participation by saying, "I might have spoken once, maybe." He conceded that he did not assert any right to custody of M.L.P., or seek any visitation or other relief from the court. Again, he stated, "I don't have a very good reason for that."

Father was asked what he had done since that day to assert his rights to M.L.P., and Father replied, "To assert my parental rights – nothing." When asked about his failure to provide support for M.L.P. or attempt to visit, Father stated:

> Well, since I didn't get to have any contact or see him I was not going to give any support. Why should I give support if I can't contact, I can't see, talk, nothing to my child because someone thinks it's not in the child's best interest.
> . . .
> Sir, after being told for so long that I can't – what I did, I get myself into position till now. I've been on my job for eight years. I have a stable house. All my instability was because of my partner in life. We were unstable and it made my life unstable. I've got my life stable and that's why I'm here now.

Father stated that the last time he spoke to M.L.P. was during the two February 2004 phone conversations, with the exception of one time when Mother was talking to M.L.P. on the phone and Father talked to him briefly. Father admitted that he had never offered financial support to Grandmother or to Great Aunt to help with M.L.P.'s care. When asked about his ability to support M.L.P., Father stated that he had been employed at the same job for eight years, and that he makes fifteen dollars per hour, or roughly $37,000 per year. Father stated that he was financially capable of supporting M.L.P. in 2003 because he still lived with Mother at that time, but that after Mother left, his "money was tied up" in paying bills with only one income. Father explained that his "money is free now," and he wanted custody of M.L.P.

The special judge questioned Father about his failure to take any more steps toward gaining custody of M.L.P. since he voluntarily acknowledged paternity, and Father stated that he had been trying to get himself stable. The special judge pointed out that it had been over a year between the time that Father left the hearing that day until the petition to terminate his parental rights was filed.

Father stated that he understood the judge's point, and said, "I don't really have a good answer for that. I don't really know the right path to take action sometimes on stuff like that."

Father had never met with the guardian ad litem prior to the day of trial. She questioned him at trial and ultimately expressed her opinion that she believed Father's parental rights should be terminated, and that doing so would be in the best interest of M.L.P.

At the conclusion of the testimony, the special judge discussed in open court his concerns regarding Mother's family's attempts to interfere with Father's visitation, and whether that excused Father from taking further action to maintain contact with M.L.P. The judge noted that the only positive step Father had taken since his telephone calls in February 2004 was to acknowledge paternity. The special judge also mentioned that he was the referee who initially recommended that Great Aunt and Uncle be granted temporary custody of M.L.P. in the dependency and neglect proceeding, and he did so because he thought "there was no father at that point." On the other hand, the judge questioned whether parental rights could be terminated when other parties were part of the reason that the parent did not visit the child. The judge also noted that no one ever asked Father for child support.

The special judge stated that he would withhold his decision until the next day because he wanted to review several cases that addressed the issue before him. The attorneys were unable to return the next day, so they were told to return the next week. The judge informed them that he would review any case law that they submitted in the interim, and that the attorneys could briefly comment before he ruled, if they wished. The judge told the parties that they could also return, however, the judge stated that he would not hear any additional testimony and that he was only taking the matter under advisement.

The following week, the parties and their attorneys returned to court. At that point, counsel for Father orally moved to dismiss the petition to terminate Father's parental rights, stating that his client's constitutional rights had been violated. He explained:

> The reasoning is, if this were a DCS case, DCS would have advised him of the Abandonment Statute. That creates a problem in that it wasn't a DCS case. The Court's upheld, though, that the termination of parental rights in a private adoption still requires a State action. So, what we have here is a State action and my client being placed in a class different from those who[se] child goes to DCS. And under those circumstances I think that his Fourteenth Amendment Due Process Rights and Equal Protection Rights have been violated.

The special judge did not comment on this issue and proceeded to briefly discuss the issue of Mother's family interfering with Father's visitation rights. The judge concluded that the termination petition would be dismissed because he could not find that Father willfully abandoned M.L.P. when Mother's family frustrated his attempts to visit the child.

The court accordingly entered an order dismissing the petition, finding that Father did not abandon M.L.P. according to the relevant statute, and that the petitioners had failed to prove other grounds for terminating Father's parental rights. The order further stated the court's finding that Great Aunt and Uncle had frustrated attempts by Father to contact and bond with M.L.P. The petitioners below, Great Aunt, Great Uncle, and the Clarksons, filed a timely notice of appeal.

## II. ISSUES PRESENTED

The following issues are presented for our review by the appellants:

1. Did the trial court err in denying the petition to terminate Father's parental rights to M.L.P. when clear and convincing evidence supported a finding that parental rights should be terminated according to Tennessee Code Annotated section 36-1-102 and section 36-1-113 based on the grounds of abandonment and persistent conditions?

2. Did the trial court err in denying the petition to terminate Father's parental rights to M.L.P. when clear and convincing evidence supported a finding that termination of Father's parental rights was in the best interest of M.L.P.?

Additionally, Father presents the following issue for review:

3. Did the failure to advise Father of the law relating to abandonment, pursuant to Tennessee Code Annotated section 37-2-403, violate his rights to due process and equal protection under the federal and state constitutions?

The Attorney General has also filed a brief in this matter defending the constitutionality of Tennessee Code Annotated section 37-2-403 and further contending that Father waived his constitutional challenge by failing to raise it in a timely manner and in a procedurally proper way in the lower court.

For the following reasons, we reverse the decision of the juvenile court and remand for further proceedings consistent with this opinion.

## III. STANDARDS FOR REVIEWING TERMINATION CASES

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005) (citing *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2059-60, 147 L.Ed.2d 49 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *Ray v. Ray*, 83 S.W.2d 726, 731 (Tenn. Ct. App. 2001)). This right exists notwithstanding the marital status of the child's biological parents where the biological parent has established or is attempting to establish a relationship with the child. *Id.* at 860, n.31. Although this right is fundamental and superior to the claims of other persons and the government,

it is not absolute. *Id.* The parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also **In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. ***In re Audrey S.***, 182 S.W.3d at 860. A court may not terminate a parent's rights to his or her children unless there is specific statutory authority to do so. ***Osborn v. Marr***, 127 S.W.3d 737, 739 (Tenn. 2004). "Because the legislature specifically designated who may file a petition to terminate parental rights, a court does not have subject matter jurisdiction to hear such a petition unless the party filing the petition has standing." *Id.* at 740. In parental termination cases, standing is a necessary prerequisite to the court's exercise of subject matter jurisdiction, and we must consider the issue of standing even though it was not raised by the parties. *Id.* (citing Tenn. R. App. P. 13(b)).

Tennessee Code Annotated section 36-1-113(b) lists the parties who have standing to file a petition to terminate parental rights. At the time when Great Aunt, Great Uncle, and the Clarksons filed their petition to terminate Father's parental rights, the statute provided, in relevant part:

> The prospective adoptive parent or parents of the child, including extended family members caring for related children, any licensed child-placing agency having custody of the child, the child's guardian ad litem, a court appointed special advocate (CASA) agency, or the department shall have standing to file a petition pursuant to this part or pursuant to Title 37 to terminate parental or guardianship rights of a person alleged to be a parent or guardian of such child.

Tenn. Code Ann. § 36-1-113(b) (2005). This statute is clear and unambiguous. ***Osborn***, 127 S.W.3d at 740. If a termination petition was not filed by one of the persons or entities with standing, the trial court lacked jurisdiction to hear the petition, and we must vacate its judgment and dismiss the case. *See id.* at 741 (dismissing a termination petition filed by the child's other parent for lack of standing and subject matter jurisdiction).

In this case, Great Aunt and Uncle did not have standing to file a petition to terminate Father's parental rights, as they are not members of any of the groups to whom the statute grants standing. Extended family members caring for related children are granted standing *if* they are prospective adoptive parents, and Great Aunt and Uncle are not. Therefore, we must dismiss the petition insofar as Great Aunt and Uncle seek such relief. *See **In re Adoption of Kleshinski***, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *17 (Tenn. Ct. App. W.S. May 4, 2005). However, we find that the Clarksons have standing under the statute as "prospective adoptive parents," as that term is defined by Tennessee Code Annotated section 36-1-102(41) (2005). Therefore, Great Aunt and Uncle's lack of standing does not affect our analysis or the outcome of this appeal. *See id.*

"Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First of all, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, they must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.* Because no civil action carries graver consequences than a petition to sever family ties forever, a person seeking to terminate parental rights must prove both of the elements for termination by clear and convincing evidence. *Id.* at 860-61. In sum, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Clear and convincing evidence has been defined as evidence that "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *In re L.J.C.*, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003) (quoting *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861.

Because of the heightened burden of proof in parental termination cases, on appeal, we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *Id.* However, because construing statutes and applying law to the facts are questions of law, *In re D.L.B.*, 118 S.W.3d 360, 365 (Tenn. 2003), a trial court's ruling regarding whether the facts of a case support a ground for termination must be reviewed *de novo* with no presumption of correctness. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *State, Dep't of Children's Services v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *3 (Tenn. Ct. App. Aug. 31, 2007). We must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) clearly and convincingly establish the elements required to terminate parental rights. *In re Audrey S.*, 182 S.W.3d at 861.

## IV. GROUNDS FOR TERMINATING FATHER'S PARENTAL RIGHTS

"Parental rights may be terminated in only a limited number of statutorily defined circumstances." *Means v. Ashby*, 130 S.W.3d 48, 55 (Tenn. Ct. App. 2003) (quoting *In the Matter of T.S. and M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *4 (Tenn. Ct. App. July 13, 2000)). Nine grounds for termination are listed in Tennessee Code Annotated section 36-1-113(g). The existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights, *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004), provided that termination is in the best interest of the child. *In re Audrey S.*, 182 S.W.3d at 862. The petition in this case alleged that two of those grounds existed in this case: (1) abandonment, and (2) persistence of conditions. Tenn. Code Ann. § 36-1-113(g)(1), (3).

### A. *Abandonment*

The first ground for termination listed in the statute, and the one most frequently relied on, is abandonment. *In re Audrey S.*, 182 S.W.3d at 862. There are five alternative definitions of abandonment for purposes of terminating parental rights. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i)–(v) (2005). Pursuant to the first definition, which is the one relevant to this case, "abandonment" means that:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2005). Abandonment is established by showing *either* that a parent willfully failed to visit *or* willfully failed to support[3] the child during the relevant time period. *In re Adoption of McCrone*, No. W2001-02795-COA-R3-CV, 2003 WL 21729434, at *10 (Tenn. Ct. App. July 21, 2003). The willful failure to visit, support, or make reasonable payments toward the support of the child must have occurred in the four months immediately preceding the filing of the termination petition currently before the court. *In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003).

It is undisputed that Father did not visit or support M.L.P. during the four month period leading up to August 16, 2005, the date of the termination petition. Father had not seen M.L.P. since Mother left Father after Christmas of 2003, and Father never sent financial support or gifts to M.L.P. while he lived with Great Aunt. However, Father argues that his failure to visit or support M.L.P. was not willful because Great Aunt interfered with his visitation. The trial court concluded that Father "did not abandon said child as required by statute" and specifically found that Great Aunt and Uncle "have frustrated attempts by the father to contact and bond with said child."

Failure to visit a child for four months does not constitute abandonment if it was not willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). "The requirement that the failure to visit or support be 'willful' is both a statutory and a constitutional requirement." *In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *17 (Tenn. Ct. App. W.S. May 4, 2005). Therefore, the element of willfulness is essential, and central to the determination of

---

[3] For purposes of the statute, the parent must have engaged in more than "token visitation" or provided more than "token support" during the four month period. "'[T]oken visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C) (2005). "'[T]oken support' means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B) (2005).

abandonment.[4]  ***In re M.L.D.***, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); ***In re C.M.C.***, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *6 (Tenn. Ct. App. Aug. 3, 2005).

Where a parent has been thwarted in visitation efforts by the acts of others and circumstances beyond his control, courts have refused to find willful abandonment.  ***Id.***; ***In re F.R.R.,III***, 193 S.W.3d 528, 530 (Tenn. 2006).  However, willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent have acted with malice or ill will.  ***In re Audrey S.***, 182 S.W.3d at 863; *see also* ***In re S.M.***, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004).  Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts.  ***Id.***  Willful conduct is the product of free will rather than coercion.  ***Id.***  A person acts willfully if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.  ***Id.*** at 863-64.  "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so."  ***Id.*** at 864 (citing *In re M.J.B.*, 140 S.W.3d at 654).  One's failure to visit or support is not excused by another person's conduct unless that person's conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.  ***Id.***; ***In re M.L.D.***, 182 S.W.3d at 896.  Some examples of conduct that amounts to such a significant restraint or interference includes: (1) telling a man that he is not the child's biological father; (2) blocking access to the child; (3) keeping the child's whereabouts unknown; (4) vigorously resisting a parent's efforts to support the child; or (5) vigorously resisting a parent's efforts to visit the child.  ***In re Audrey S.***, 182 S.W.3d at 864, n.34.  A parent's duty to visit is separate and distinct from the duty to support, and therefore, attempts by others to frustrate or impede a parent's visitation with a child do not justify the parent's failure to support the child financially.  ***Id.*** at 864.

Willfulness of a parent's conduct depends upon the person's intent, and intent is seldom capable of direct proof.  ***In re Audrey S.***, 182 S.W.3d at 864 (citing *In re Adoptoin of S.M.F.*, No.

_____

[4]  The dissent insists that the abandonment analysis "requires a finding that the parent had knowledge that failing to visit his child for four consecutive months could result in termination of parental rights." As support for this statement, the dissent cites the unreported case of ***In re: W.B., IV***, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *11-12 (Tenn. Ct. App. Apr. 29, 2005) (no Tenn. R. App. P. 11 application filed).  We do not read ***In re: W.B., IV*** as requiring such knowledge by the parent as a prerequisite to terminating rights based on abandonment.  In that case, the Court recognized that the statute requiring specific notice of the parental termination laws does not apply in cases not involving the Department of Children's Services or a similar agency.  The Court went on to say, however, that in cases involving private parties, a parent's "knowledge of a duty or expectation that she provide support and visit is *a factor* in determining willfulness." *Id.* at *11 (emphasis added).  The Court then considered several other factors in considering whether the mother in that case willfully abandoned her children, including the fact that she was unaware of their whereabouts for three of the four relevant months.  It is not at all clear that the mother's lack of knowledge about the parental termination laws was "determinative in the Court's holding," as the dissent contends.  We also note that no other court has cited ***In re: W.B., IV*** for the notion that before we can find abandonment, we must first find the parent had knowledge that failing to visit for four months could result in termination of parental rights.

-13-

M2004-00876-COA-R9-PT, 2004 WL 2804892, at *8 (Tenn. Ct. App. Dec. 6, 2004)). Triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations and must infer intent from circumstantial evidence, including the parent's actions or conduct. *Id.* A person's demeanor and credibility as a witness also play an important role in determining intent. *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003). Because testimony may be critical to the determination of whether a parent's conduct was willful, trial courts are the proper courts to make a determination of willfulness. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). The question of intent or willfulness depends on the totality of the circumstances, and the facts must be applied to the standard definition of willfulness.[5] *V.D. v. N.M.B.*, No. M2003-00186-COA-R3-CV, 2004 WL 1732323, at *6 (Tenn. Ct. App. July 26, 2004).

In the case before us, the juvenile court concluded that Father did not abandon M.L.P., and its single factual finding explaining its conclusion was that Great Aunt and Uncle "frustrated attempts by the father to contact and bond with said child." The evidence supports a finding that Great Aunt interfered with Father's attempts to visit M.L.P. in February of 2004, when Father asked to come and visit him at Great Aunt's house. However, it is undisputed that Father did not attempt to call or contact M.L.P. since then, and the petition to terminate his parental rights was filed in August of 2005. M.L.P. had been adjudicated dependent and neglected in the meantime, and Father did not attend or participate in those proceedings beyond his one brief appearance when, by his own admission, he "might have spoken once, maybe" and did not seek custody or visitation with M.L.P. Father attempts to justify his failure to visit by claiming that Great Aunt "actually prevented" him from seeing M.L.P., but Father was clearly aware of his rights as a parent and simply chose not to assert them. When Father was asked about his decision to acknowledge paternity, he stated, "If I was on the birth certificate, I would have went and picked my child up from [Great Aunt's] house and there would have been nothing that could have stopped me." However, a new birth certificate was issued on May 4, 2004, and Father did nothing thereafter to assert any interest in obtaining custody of M.L.P. Father threatened to take Great Aunt to court, and he later advised Mother that, as a legal parent, "there's no one that can stop her, by law, from taking that child back from her aunt." Yet, Father never attempted to take such action on his own behalf. Where a parent's visits with a child have resulted in enmity between the parties and where the parent redirects his or her efforts at maintaining a parent-child relationship to the courts, the evidence does not support a finding of

---

[5] Relevant satutes do not require us to find that Father was aware, or had been advised, that his parental rights could be terminated if he did not visit M.L.P. for four consecutive months. Proceedings to terminate a parent's parental rights are governed by statute in Tennessee. *In re Audrey S.*, 182 S.W.3d at 860. The failure to visit must have been willful, meaning intentional or voluntary, but we may infer a parent's intent to abandon from circumstantial evidence. *See In re Audrey S.*, 182 S.W.3d at 864; *In re S.M.*, 149 S.W.3d 632, 642-43 (Tenn. Ct. App. 2004); *In re: W.B., IV*, 2005 WL 1021618, at *9. We note that Judge Kirby invited the Tennessee Supreme Court and the Tennessee legislature to address this same issue in her dissent in *In re Adoption of A.M.H.*, No. W2004-01225-COA-R3-PT, 2005 WL 3132353, at *107 (Tenn. Ct. App. Nov. 23, 2005). Neither the Supreme Court nor the legislature has chosen to do, and the law as it presently exists does not require the analysis the dissent endorses. Instead, the question of willfulness depends on the totality of the circumstances. The legislature apparently recognizes that a private party is not obligated to offer legal advice to an opposing party while a state agency, on the other hand, is required to do so. This appears to be a rational distinction.

"willful failure to visit" as a ground for abandonment. ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 810 (Tenn. 2007). For example, in the ***A.M.H.*** case, the parents "actively pursued legal proceedings to regain custody of A.M.H. during the 'abandonment' period but failed to visit . . . ." ***Id.*** Our Supreme Court held that the parents' actions prevented a finding of willful abandonment. ***Id.*** In another case, an adoption agency essentially took the position to force a father to litigate if he desired to develop a relationship with his child, advising him to hire a lawyer and file suit. ***In re S.M.***, 149 S.W.3d 632, 643 (Tenn. Ct. App. 2004). The father did just that, hiring a lawyer within days and filing a parentage action within a month. ***Id.*** Again, taking such action to enforce his rights prevented a finding of abandonment. ***Id.*** Here, though, Father chose not to take any type of action to enforce his parental rights. When asked why he did nothing for over a year, Father simply said, "I don't really have a good answer for that."

Unfortunately, Father did nothing in this case to attempt to maintain even minimal contact with M.L.P. through a card, letter, or gift. Father testified that Great Aunt let him speak to M.L.P. twice in February of 2004, yet Father did not attempt to call M.L.P. again after that month. In ***In re D.M.D.***, No. W2003-00987-COA-R3-PT, 2004 WL 1359046, at \*4 (Tenn. Ct. App. June 17, 2004), a mother claimed that she quit calling her child at his aunt and uncle's house after she had an argument with the aunt and uncle because she didn't want to upset the child. We stated that one unpleasant telephone conversation did not support a determination that the mother was prevented or significantly hindered from visiting or maintaining contact with her child. ***Id.*** A third party's "mere efforts to frustrate or discourage visitation or support do not necessarily justify a parent's failure" to visit or support. ***V.D. v. N.M.B.***, No. M2003-00186-COA-R3-CV, 2004 WL 1732323, at \*6 (Tenn. Ct. App. July 26, 2004). The third party's conduct must amount to a significant restraint or interference. ***Id.*** As we have previously stated:

> We do not wish to minimize the difficulties a parent may encounter in trying to arrange visitation with a child who is in the custody of a guardian who is less than helpful in making those arrangements. It appears to us, however, that such difficulties do not excuse a parent from attempting to maintain a relationship with a child through whatever means are feasible.

***V.D. v. N.M.B.***, 2004 WL 1732323, at \*6.

The last action Father took, prior to this proceeding, to demonstrate any interest in being a father to M.L.P. was acknowledging paternity prior to May of 2004. These proceedings were instituted in August of 2005, and Father then expressed his desire to have custody of M.L.P. Tennessee Code Annotated section 36-1-102(1)(F) states that a parent may not repent of abandonment by resuming visitation or support subsequent to the filing of a petition seeking to terminate parental rights. *See also* ***In re D.L.B.***, 118 S.W.3d 360, 366 (Tenn. 2003).

As a question of law, the trial court's ruling that the facts of this case do not sufficiently support the termination ground of willful abandonment is reviewed *de novo* with no presumption

of correctness. ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 810 (Tenn. 2007). We find clear and convincing evidence that Father abandoned M.L.P. within the meaning of Tennessee Code Annotated section 36-1-102(1)(A)(i) by willfully failing to visit or even contact M.L.P. for more than four months preceding the filing of the petition to terminate his parental rights. It is undisputed that Father made absolutely no attempt to maintain a relationship with M.L.P. for over a year. Therefore, grounds existed for termination of his parental rights.[6]

### B.    Best Interest

"To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." ***In re F.R.R., III***, 193 S.W.3d 528, 530 (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Because the law requires both grounds for termination and a determination regarding the child's best interest, it cannot be presumed that the existence of grounds necessarily leads to the conclusion that termination is warranted. ***Brown v. Rogers***, No. M2000-01277-COA-R3-CV, 2001 WL 92083, at *4 (Tenn. Ct. App. Feb. 5, 2001). *See, e.g.*, ***In re C.E.P.***, No. E2003-02410-COA-R3-PT, 2004 WL 2191040, at *6 (Tenn. Ct. App. Sept. 29, 2004) (finding that termination was not in the child's best interests even after finding grounds for termination).

In this case, the trial court found that grounds for termination did not exist and did not reach the issue of whether termination would be in the best interest of M.L.P. Because we reverse the juvenile court's finding that Father had not abandoned M.L.P., we must remand this cause to the trial court for consideration of whether termination of Father's parental rights is in the best interest of the child, utilizing the factors set forth in section 36-1-113(i). *See **In re D.M.D.***, No. W2003-00987-COA-R3-PT, 2004 WL 1359046, at *5 (Tenn. Ct. App. June 17, 2004) (finding grounds for termination and remanding for a best interest determination); *see also **In re Adoption of McCrone***, No. W2001-02795-COA-R3-CV, 2003 WL 21729434, at *10 (Tenn. Ct. App. July 21, 2003); ***In re Adoption of Dunaway***, No. 03A01-9811-CH-000380, 1999 WL 552873, at *1-2 (Tenn. Ct. App. E.S. July 29, 1999); ***Bryant v. Bryant***, No. 01A01-9806-CV-00337, 1999 WL 43282, at *5 (Tenn. Ct. App. W.S. Feb. 1, 1999).

### C.    Father's Constitutional Challenge

Just before the special judge announced his ruling, Father's attorney briefly asserted that "this process" violated his client's constitutional rights because he was not informed by anyone that a failure to visit or support his child for four months would constitute grounds for terminating his parental rights. He did not refer to any statute as the basis of his argument, but on appeal, he asserts that "the failure to advise [Father] of the law relating to abandonment, pursuant to Tennessee Code

---

[6] The appellants' alternative arguments regarding grounds for termination are pretermitted, as the existence of any one statutory basis for termination of parental rights will support a decision to terminate those rights. *See **In re S.R.C.***, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); ***In re J.J.C.***, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004).

Annotated section 37-2-403, violated his rights to due process and equal protection under the federal and state constitution." The juvenile court judge did not rule or even comment on this issue.

Tennessee Code Annotated section 37-2-403 establishes requirements for a permanency plan for children placed in foster care, with foster care being defined as the placement of a child in the custody of the department of children's services ("DCS"), or any agency, for care outside the home of a parent or relative. Tenn. Code Ann. § 37-2-402(5). The statute also establishes requirements for notice to the child's parents of the definition and potential consequences of "abandonment," as that term is defined in Tennessee Code Annotated section 36-1-102. If DCS fails to show that a parent was given the notice required by Tennessee Code Annotated section 37-2-403, it is precluded from proceeding to terminate the parent's rights on the ground of abandonment. *See, e.g.*, *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *10 (Tenn. Ct. App. June 30, 2005). "[W]ithout proof in the record of compliance with the notice provisions of Tenn. Code Ann. § 37-2-403, a trial court's finding of abandonment must be set aside." *In re D.D.K.*, No. M2003-01016-COA-R3-PT, 2003 WL 23093929, at *7 (Tenn. Ct. App. Dec. 30, 2003) (citing *In the Matter of C.L.H. et al*, No. M2000-02799-COA-R3-JV, 2001 WL 605101, *5 (Tenn. Ct. App. June 5, 2001)). Because M.L.P. was not placed in the custody of an agency, such as DCS, no permanency plan was required that would include the notice provisions, and the statute was not violated.

Father's last minute attempt to challenge the constitutionality of the statute on the basis that it places Father "in a class different from those who[se] child goes to DCS" was not properly raised in the trial court, and we will not address it on appeal. It has long been the general rule that questions not raised in the trial court will not be entertained on appeal, and this rule also applies to an attempt to make a constitutional attack upon the validity of a statute for the first time on appeal unless the statute involved is so obviously unconstitutional on its face as to obviate the necessity for any discussion. *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983) (citing *City of Elizabethton v. Carter County*, 204 Tenn. 452, 321 S.W.2d 822 (1958); *Veach v. State*, 491 S.W.2d 81 (Tenn. 1973); *Harrison v. Schrader*, 569 S.W.2d 822 (Tenn. 1978); *Dorrier v. Dark*, 537 S.W.2d 888, rehearing 540 S.W.2d 658 (Tenn. 1976)). When the constitutional validity of a statute is not properly raised in the trial court, there is no opportunity for the introduction of evidence which might be material and pertinent in considering the validity of the statute. *Id.*

In *In re Adoption of E.N.R.*, 42 S.W.3d 26, 31-32 (Tenn. 2001), a parent similarly raised a constitutional challenge to a specific portion of the parental termination statutes during closing arguments, and the trial court did not even rule on the issue. Our Supreme Court stated:

> A conclusory contention that a statute is unconstitutional, raised for the first time in closing argument and only after the court indicates the merits do not weigh in that litigant's favor, does not present an attractive issue for appellate review.
> . . .
> The record shows that the constitutional challenge in this case was late-raised, minimally addressed, characterized by counsel as

mentioned only for the purpose of preserving it for appeal, and perhaps was simply a last ditch effort to overcome the court's preliminary findings in favor of the opposition. To now rely upon the importance of this issue as grounds for appellate review is near hypocrisy given the short shrift it received at trial where it could have, and should have, been fully adjudicated. *See* Tenn. R. App. P. 36 (appellate court need not grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); *cf. In re Shane*, 58 Conn.App. 234, 753 A.2d 409, 415 (2000) (refusing to consider incarcerated mother's Eighth Amendment challenge to termination of parental rights due to scant analysis in brief).

The Court also noted that there is little difference between an issue improperly raised before the trial court at the last minute and one that was not raised at all. **Id.**

In addition, the Office of the Attorney General was not notified of Father's effort to challenge the constitutionality of the statute, as is specifically required at the trial level by Tennessee Code Annotated section 29-14-107(b): "if [a] statute, ordinance, or franchise is of statewide effect and is alleged to be unconstitutional, the attorney general and reporter shall also be served with a copy of the proceeding and be entitled to be heard." The Tennessee Rules of Civil Procedure also require notice to be provided to the attorney general at the trial level:

Rule 24.04   Notice to Attorney General When Statute, Rule or Regulation Is Questioned – When the validity of a statute of this state or an administrative rule or regulation of this state is drawn in question in any action to which the State or an officer or agency is not a party, the court shall require that notice be given the Attorney General, specifying the pertinent statute, rule or regulation.

Tenn. R. Civ. P. 24.04.  No such notice was provided at the trial level in this case.

In short, we find that the statute is not blatantly unconstitutional, and we decline to consider the issue further on appeal because it was not properly raised in the trial court.

## V. CONCLUSION

For the aforementioned reasons, we reverse the decision of the juvenile court and remand for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellee, Marcus Grimes Pritchett, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P. J., W. S.