IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 4, 2013

**IN RE AUTUMN R.W., ET AL.**

**Appeal from the Juvenile Court for Knox County**
**No. 44168     Tim Irwin, Judge**

**No. E2012-02105-COA-R3-PT-FILED-MARCH 21, 2013**

This appeal concerns a termination of parental rights. The trial court, upon finding clear and convincing evidence of two grounds on which to base termination and concluding that termination was in the children's best interest, revoked the mother's parental rights to three of her minor children. The mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Robin Gunn, Knoxville, Tennessee, for the appellant, Tiffany L. W.[1]

Robert E. Cooper, Attorney General & Reporter, and Mary Byrd Ferrara, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Angela Blevins, Knoxville, Tennessee, Guardian ad Litem.

**OPINION**

**I. BACKGROUND**

This matter involves the petition to terminate the parental rights of Tiffany L. W.

---

[1]It is the policy of this court to identify the last names of those involved in termination proceedings by initial.

("Mother") to three of her minor children: Franklin C. L. M. (d.o.b. 10/27/08), Autumn R. W. (d.o.b. 8/14/09), and Halleigh S. W. (d.o.b. 6/26/10) (collectively, "the Children").[2] All the Children initially were removed from Mother's custody in August 2010 for environmental neglect. The record reflects that on the morning of August 30, 2010, law enforcement found the Children locked up alone in Mother's apartment. Each child was found crying in a closed bedroom. They were wearing filthy clothes reeking of urine, feces, and food, and each wore a dirty diaper. They were all extremely hungry. Upon investigation, the Department of Children's Services ("DCS") found that the Children were living in deplorable and unsanitary conditions. The apartment smelled strongly of urine, and the floors were covered with clothing and trash. In the kitchen, food was mixed with the trash on the floor. The tray on the highchair was coated with layers of leftover food.

After a preliminary hearing on September 7, 2010, the juvenile court found probable cause that the Children were dependent and neglected based on allegations that Mother was suffering from postpartum depression and, as a result, was unable to provide appropriate care and supervision. Temporary custody of the Children was awarded to Bill and Reba W., the maternal great-grandparents ("Great-Grandparents"). The Children subsequently resided with Great-Grandparents for approximately three months, after which time DCS put home services in place and the Children were returned to Mother's care. Mother was directed to comply with the requirements of her mental health treatment and to utilize the provided services.[3] Additionally, she was ordered to maintain reasonable housekeeping standards.

In June 2011, DCS received a report that the Children again were at risk. An investigator traveled to Mother's home to investigate the referral. Mother was sitting on the stoop outside of her apartment when the investigator arrived and showed reluctance to allow him to enter the home; he was forced to threaten court involvement to gain entry. Once inside, he observed the Children were present. He found the home to be filthy and smelling of rotting food, urine, and feces. The oldest child, Tanalea, appeared to be clean and dressed appropriately. Franklin and Autumn, however, wore unclean clothes and were filthy. Dirty laundry and a crib sheet encrusted with feces was piled on the kitchen floor. Flies were hovering around the laundry pile. Unwashed dishes were stacked on the kitchen counters. A highchair tray was piled with a partially eaten chicken bone and dried out, glazed over, sliced meat and gravy. The vinyl floors in the kitchen and living room were caked with dirt.

---

[2]An older child, Tanalea S.W., is not a subject of this appeal. The maternal great-grandparents ultimately were granted full legal and physical custody of her.

[3]Mother had been diagnosed with Major Depressive Disorder, Post-traumatic Stress Disorder, Panic Disorder without Agoraphobia, and Borderline Personality Disorder.

Mother protested that she was in the process of cleaning the apartment, and was working her way down from the upstairs. Upon the investigator going upstairs, however, the room in which all four children were living had a strong smell of excrement. Halleigh thereafter was found lying in a crib covered from head to toe in feces. Her diaper was full of feces and urine, and the crib sheet likewise was soiled. Halleigh was removed from the crib and washed off in the sink.[4] The investigator finished talking with Mother on the front step of the home because the smell inside was intolerable.

The Children's great-grandmother ("Great-Grandmother") was contacted for assistance. Upon her arrival, Mother stated, "If you would have taken the kids the other day this would not have happened." When the investigator told Mother that the Children were her responsibility, not Great-Grandmother's, Mother handed Halleigh to Great-Grandmother while declaring, "Take Halleigh, I am going to fuck him up." Once Mother calmed down and the situation was discussed, it was determined that Great-Grandparents could care for the oldest child (Tanalea), but they lacked the ability to care for the three younger children. Mother signed an immediate protection agreement, permitting temporary removal of the Children until the situation could be remedied. She admitted that she was not taking her depression medication and had terminated the mental health services. Mother was asked to take a drug test and refused, admitting that she would be positive for marijuana and had a "roxy" in her system. It was requested therefore that she complete a drug and alcohol assessment. Additionally, she was directed to clean her home.

An order entered July 6, 2011, provided that Mother was to pay $10 per child per month in temporary token child support pending a later hearing. On August 4, 2011, the juvenile court adjudicated the Children to be dependent and neglected, and awarded temporary custody to the State, effective as of July 1, 2011. Mother was allowed supervised visitation. A permanency plan ("Plan I") was developed at a Child and Family Team Meeting ("Team Meeting"). Mother related that she had begun using drugs to help her cope with the stress of raising four children on her own. When questioned about the previous services that DCS had provided for her, Mother stated that she had "kicked out Helen Ross McNabb and Foothills." She admitted to recent use of marijuana and past crack cocaine use; she agreed to a drug screen at the meeting, and thereafter failed a hair follicle test for cocaine and THC. Mother asserted that she had been diagnosed with bipolar disorder and postpartum depression, but was not receiving treatment. She observed she was working with HUGS and Solution Source and agreed to get counseling. She did not admit, however, to needing assistance to quit her drug use, and she opined that she could quit "cold turkey."

---

[4]There were diaper rash and yeast infection issues that ultimately required medical attention involving Halleigh and Autumn.

Concerning the environmental neglect, Mother was required in Plan I to maintain a clean, safe, and stable home environment and to comply with all services provided by DCS to address those matters. With regard to the substance abuse and mental health issues, Mother was required to cease using illegal substances and to deal with her mental diagnoses. Additionally, she was directed to comply with all addiction/mental health services provided by DCS. Mother acknowledged her participation in Plan I's development and a receipt of a copy by her signature. The Criteria and Procedures For Termination of Parental Rights ("the Criteria"), which include very clear instructions regarding the need to pay child support and the consequences of failing to do so, also were reviewed and signed by Mother.

On September 14, 2011, a juvenile court order noted that Mother "is not in compliance in that she has made little progress on the permanency plan requirements," and that her progress toward resolving the reasons the Children are in foster care is "marginal." In October 2011, Solution Source discharged Mother from its mental health treatment program for non-compliance. Mother was admitted to Cherokee Health's ("Cherokee") mental health treatment program in mid-October 2011, and followed up with it through November, 2011, when she began to be an occasional no-show.

Shelby Quinley, Mother's DCS caseworker, provided testimony at the termination hearing. She recalled making a home visit to Mother in November 2011, at which time she found clothes all over the floor, along with dishes containing old food. There was a small crib in the den without bedding. A man named William Edward Burress was living in the home at that time with Mother. He informed Ms. Quinley that he is the father of five children who have been removed from his custody and that he could not pass a drug screen because he had used crack within the past three weeks. Mother told Ms. Quinley that her mother, Pam, was planning to move into her home to help with the cleaning. Mother became very upset when she was advised that because her mother is not allowed unsupervised visitation with the Children, her presence along with Mr. Burress's issues would prevent the Children from being returned to the home.

DCS again visited Mother's home in December 2011. According to Ms. Quinley, the home at that time appeared to be safe and clean. Mother's mother and her husband and two dogs were living in the home with Mother, but Mr. Burress was no longer residing there. No beds, toys, or clothes for the Children were present.

On a visit in January 2012, DCS found that one of the dogs had given birth to a litter of puppies on a mattress and part of the floor in the Children's room and it had not been

cleaned up.[5] Ms. Quinley found clothing on the floor upstairs, and dishes and more clothes blanketing the downstairs area of the home. Upon a return to the home two hours after the initial visit, she found two men cleaning the apartment while Mother and her family sat on the couch watching television and smoking cigarettes.

The record reveals that Mother entered into treatment with Cherokee in January 2012, but she was discharged from the program the following month as a result of her failure to attend medical management appointments. No further mental health assessments were provided to DCS or to the juvenile court. On a positive note, Mother had six months of clean drug screens until March 2012, at which time she tested positive for marijuana.

On March 28, 2012, Mother and DCS updated Plan I ("Plan II")(collectively, "the Plans"). In addition to the action steps required in Plan I, Plan II required that Mother consistently maintain housing that is "clean, safe, and appropriate with no environmental hazards." Plan II further required Mother to comply with all court orders, cooperate with DCS and all service providers, maintain contact with DCS at least twice per month, notify DCS of any changes of circumstances, participate in Team Meetings and cooperate with DCS with verification of completion of any of the Plan II goals, visit the Children regularly, allow DCS to visit the home quarterly, and pay child support. Additionally, Plan II required Mother to attend Helen Ross McNabb in order to complete an alcohol and drug assessment, intensive outpatient treatment, and follow though with recommendations, and to submit to random drug screens. Plan II also referred Mother to the Florence Crittenton Agency for a psychological evaluation and required Mother to follow all recommendations. Finally, Plan II also required Mother to participate in the Children's medical care and see that they attend all medical appointments in a timely manner. Mother signed Plan II, acknowledging her participation in creating it, and the Criteria again were explained to her.

In an April visit, Ms. Quinley discovered that Mother's mother was no longer living in the home, but a man named Cecil Lee was residing now in the apartment. The home was clean, but clothes were covering the floor, and dirty dishes with discarded food were everywhere. No bedroom was set up for the Children. After the April 2012 visit, DCS did not return to the home again until August 2012, because Mother called DCS and said, "You need to not have Shelby Quinley come to my house. If she does, she will get her ass beat." On April 17, 2012, DCS petitioned to terminate Mother's parental rights.[6]

_____

[5]Blood and feces, presumably from the birth of the puppies, was noted.

[6]The parental rights of the fathers of the Children have been terminated already and are not addressed in this appeal.

In an order dated May 2, 2012, the juvenile court determined that Mother "was not in substantial compliance in that she has not maintained her home in safe, sanitary condition, is not compliant with recommended mental health treatment, and admits a drug screen would be positive." The court ordered Mother to submit to a drug screen before leaving the courthouse. Although no report of a drug and alcohol assessment was provided as was required by Plan II, Mother claimed that she completed an assessment that recommended intensive outpatient treatment. She started the recommended treatment on July 17, 2012, more than one year following the removal of the Children and three months after the petition for termination was filed. Subsequent to entry into the program, however, Mother failed a drug screen on August 17, 2012, it being positive for cocaine and THC.[7] Also in August 2012, Ms. Quinley and a co-worker returned to Mother's house and found the home to be clean. Mr. Lee was still living in the home; the Children's room, however, was set up with three beds. Their inspection did not reveal any clothes or toys for the Children.

According to Ms. Quinley, she and Mother periodically discussed Mother's obligation to pay child support to or on behalf of the Children. Ms. Quinley noted that the requirement to pay child support was in Mother's Plans and addressed in the Criteria provided to Mother. She stated that Mother also received notice regarding payment procedures from the Child Support Court. Mother, however, has paid no support to the Children since they were removed from her custody. She admitted that during the removal time period she was working and earning $56 to $62 dollars a day, but claimed she did not pay anything toward child support because she was buying items for the Children for when they returned. Ms. Quinley testified, however, that she did not see any items in the home purchased specifically for the Children. Mother also did not bring items for the Children when she visited with them. The foster mother related that on perhaps two occasions the Children returned from a visit with an item that Mother had given to them. At the termination hearing, Mother conveyed probably the most honest explanation for failing to pay child support: "And why should I pay for children that I don't get to see twice a month is how I was looking at it at that point."

At the hearing on the petition for termination, Mother testified that she now realizes she is an addict and is seeking intensive treatment for her substance abuse. She noted that she was arrested for failure to pay child support on the Friday before the hearing, and claimed in court that, during her incarceration, she put a great deal of thought into her situation. Mother contended that she now is prepared to take steps to resolve her problems. She acknowledged that all the services have been available to her for two years, but observed that she had not believed she had a problem then. Mother claimed that she had been sober for 60 days prior to the hearing. A DCS drug screen for Mother on August 17, 2012, however,

---

[7]Mother previously had refused to participate in DCS requested drug testing since June 6, 2012.

revealed a positive test for THC.

The Children are in a pre-adoptive foster home placement where they are doing well. They are in school and meeting all medical and educational needs, and all are thriving. The Children continue visitation with Tanalea who lives with Great-Grandparents, and no evidence was offered that such visitation would cease after the termination of Mother's rights.

On September 12, 2012, the juvenile court entered an order terminating Mother's parental rights to the Children on grounds that clear and convincing evidence established that: (1) Mother had failed to substantially comply with the Plans to reunite with the Children as provided in Tennessee Code Annotated section 36-1-113(g)(2); and (2) Mother had abandoned the Children by willfully failing to support or to make reasonable payments toward their support as provided in Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(i). The court found by clear and convincing evidence that termination was in the best interest of the Children, as required by Tennessee Code Annotated section 36-1-113(i). At the hearing, the juvenile court stated as follows:

> THE COURT: The Department of Children's Services pled three grounds in this case. The Court considers the grounds that they pled in the order that they pled them. They pled the ground of abandonment. "The respondent has willfully failed to support or make reasonable payments towards the support of her children for four consecutive months." She's living in a free apartment with no children. No one has put forth a health reason as to why she's unsuitable for employment. She was just arrested for non-payment of support. Her TCSES screen shows zero. I think that burden has been met clearly and convincingly. She abandoned the children by failing to pay support for the four months immediately preceding the filing of the petition.
>
> Persistent conditions. Children have been removed by order of this Court for a period of six months. That's certainly true in this case. Conditions which led to their removal still persist. Well, the house is clean, or at least it's clean when it has been looked at. That was one of the conditions. Mom's been sober for two months. Have her mental health needs been addressed? Nobody knows. But all this was done in a stress-free environment of no children. I don't know if I can bank on two months of sobriety and infusion of three or four boisterous kids back in the home, if I can – if I can conclude that the conditions would be remedied at an early date so the children could be returned to the respondent in the near future. That's a closer call, but I'm not going to find that ground, mainly because her house is clean and mainly

-7-

because she's been sober for two months. So I do not find 3(C) in the petition.

Failed to comply in a substantial manner with those reasonable responsibilities set out in the permanency plan related to remedying the conditions which necessitate foster care placement. Too late. It's too late for me to have a track record of compliance. I can't believe an addict after two months of sobriety when you're talking about giving three kids back to them. I can't take that chance. You haven't given me enough time to bet on you. Two months is not enough. Two months is good, but it's not enough. I can't conclude that you're going to continue to remain clean and sober. That's the main thing you had to do. It's been offered to you over and over and over again.

Let me read a couple of things I marked here. Signed the criterion and procedure for termination of parental rights, Exhibit 4, 7/27/11. They're telling you what the grounds are so they can come and take your children. Then another permanency plan and another criterion signed. Then you enter an immediate protection agreement saying you're going to clean the house and complete a drug and alcohol assessment on 6/22/11. You admit in open court that you've used as recent as June of this year. I just don't know how I can take a chance on you. I mean, I find the efforts of the State have been reasonable. They've offered and offered and offered. And you might have taken advantage of some of it as of late. You know, I don't doubt that you completed parenting classes. I don't doubt that you've had a mental health assessment. I do doubt that you've followed the recommendations from it.

But I don't think that you've proven that you were clean and sober, and I don't think you've proven that you got your mental health in order at all. Those are two big things you had to do. For those reasons, I'm clearly and convincingly finding that you failed in substantial performance of the tasks on your permanency plan. So I've found two grounds.

Now, let's look at best interest of the children. To look at best interest considerations, we'll look at – let me get to my factors here. In determining whether termination is in the best interest of the child, the Court must consider whether the parent or guardian has made an adjustment of circumstances, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian. You might have done that in the past couple months. I'm not sure. I would kind of give that one a flat line, not a plus or minus. Just kind of flat line. Maybe you've done it. I don't know.

-8-

Failed to effect a lasting adjustment after reasonable efforts by available social – again, kind of a flat line. You have visited. I'll give you a plus on that one. And there is a meaningful relationship between you and your children. I think to change these children back to your care and physical environment would be a big detriment to them. I've heard how great they're doing. I've heard how far they've come. I'll give you a minus on that one.

I don't think that the next one applies at all. I think your home is healthy and safe right now. I don't know if there's criminal activity or not in there, but I don't think it will stay that way very long. You haven't shown that you've been able to accomplish this stuff when you've been given your children back over and over again.

I'm going to determine that it's not in the children's best interest – or it's in the children's best interest that your rights be terminated, along with those two grounds. They're doing beautifully where they are right now. There's nothing in the record to indicate they can't see their sister. You haven't gotten it together for two years. And this slight up-tick the past couple of months in performance is not enough to show the Court that there's a likelihood you're going to get any better in the future.

One thing I have to say that you've done throughout the whole time is you've visited, and you've visited well. But I haven't seen enough progress in the other areas for me to feel it's safe to reunite you with your children in the near future. And that's the bottom line. So I find that your rights are terminated today, and that's why.

On September 10, 2012, a corrected order of termination was entered by the court, basing the termination of Mother's parental rights on the same two grounds. Mother filed this timely appeal.

## II. ISSUES

Mother asserts that DCS failed to establish grounds for termination by clear and convincing evidence. She does not challenge the juvenile court's finding that termination is in the best interest of the Children.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C. W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), abrogated on other grounds by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug.13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

A reviewing court must review the trial court's findings of fact de novo with

a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim.* *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010) (emphasis added).


## IV. DISCUSSION

Tennessee Code Annotated section 36-1-113 provides the grounds for termination of parental rights. The applicable provisions read as follows:

> **36-1-113. Termination of parental rights.** – (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

> * * *

> (c) Termination of parental or guardianship rights must be based upon:

> > (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> > (2) That termination of the parent's or guardian's rights is in the best interests of the child.

* * *

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). . . :

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

Tenn. Code Ann. §§ 36-1-113(a) - (g)(3)(A)-(C) (Supp. 2012)[8]

The pertinent statutory definition of "abandonment" is addressed in Tennessee Code Annotated section 36-1-102:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s)

_____

[8]Recent amendments have not modified provisions applicable in this case.

or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goals when the parent or guardian is aware that the child is in the custody of the department . . . .

* * *

(B) For purposes of this subdivision (1), "token support" means that the

support, under the circumstances of the individual case, is insignificant given the parent's means.

* * *

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child;

* * *

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child;

(G) "Abandonment" and "abandonment of an infant" do not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition. Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled; and

(H) Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children . . . .

Tenn. Code Ann. § 36-1-102(1)(A)-(H) (2010).

## A. THE PLANS

In this case, the Children were removed for environmental neglect and substance abuse issues. The Plans required Mother to consistently keep her home clean and safe, cease use of illegal substances, pay child support, properly manage her mental health, and comply with all services offered to her by DCS. The Plans were reasonably related to remedying the conditions that necessitated the foster care placement for the Children.

The evidence is undisputed that throughout both periods of foster care, when the Children were not residing with her, Mother was more likely to keep her home clean. Alternatively, when the Children were returned to the home, Mother was unable to manage the stress and could not maintain the home in a sanitary and clean condition. We find that the juvenile court properly determined that Mother failed to comply with the Plans with regard to maintaining a clean home, free and clear of environmental hazards. In addition to the housekeeping deficiencies, throughout the period of removal, the home was not kept free and clear of certain relatives and other individuals with whom the Children were not to reside. The record also reflects that Mother willfully failed to provide child support to the Children.

The evidence further establishes that Mother also failed to substantially comply with the Plans by continuing to use illegal substances throughout the removal period and permitting persons who use crack cocaine to reside in the home with her while the Children were in foster care. Mother either refused to take or failed numerous drug screens while the Children were in foster care. Her trial testimony reveals that she only made a serious effort to maintain sobriety after the filing of the petition for termination.

Mother likewise clearly failed to follow through with mental health treatment and assessments, and failed to comply with the services offered to her by DCS. She related that she either "kicked out" the service providers or received letters from them that she was being dismissed from the programs for lack of compliance or attendance. The record reveals that DCS made reasonable efforts to offer services to help Mother comply with the Plans. She did not attempt to utilize the assistance until after the termination proceedings were instituted. Clear and convincing evidence supports the finding by the juvenile court that Mother failed to substantially comply with the Plans.

## B. ABANDONMENT

We have explained willfulness as:

"Willfulness" does not require the same standard of culpability required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (citations omitted).

Mother clearly was required to pay child support, but she contributed nothing to the support of the Children at any time after the removal. She provided no support in spite of the fact that she was not incarcerated or incapacitated, and was employed for some of the time period. The record reflects that Mother earned $56 to $61 per day at times during some of the applicable period, but did not pay any child support. She did not offer testimony as to why she did not secure further employment or why she failed to attempt to support the Children; rather, she declared that she failed to support the Children because she saw no reason to do so when she only saw them twice per month. The testimony is undisputed that Mother's failure to support was willful and intentional. Accordingly, clear and convincing evidence supports the determination of the juvenile court that Mother abandoned the Children by failing to pay child support.

## C. BEST INTEREST

Mother does not challenge the juvenile court's ruling that termination is in the best interest of the Children. DCS asserts that the best interest finding is supported by clear and convincing evidence in the record.

Having concluded that there was clear and convincing evidence supporting the statutory grounds to terminate Mother's parental rights, because of the importance of the best interest issue we nevertheless have considered it. After reviewing the record we find that there is clear and convincing evidence to support the trial court's finding that termination of Mother's parental rights is in the best interest of the children, Mother has failed to comply with the Plans in very significant areas such as continued use of illegal drugs and failure to consistently maintain a home free of environmental hazards. Mother neglected to make "an adjustment of circumstance, conduct, or conditions as to make it safe and in the [C]hild[ren]'s best interest to be in" Mother's home. Tenn. Code Ann. § 36-1-113(i)(1). Mother's continued drug usage, housekeeping shortcomings, and inappropriate house guests kept Mother's home from being healthy and safe as provided in Tennessee Code Annotated section 36-1-113(i)(7). Further, Mother's willful failure to contribute to the support of the Children since their removal from her custody was a factor that renders termination in the best interest of the Children. Tenn. Code Ann. § 36-1-113(i)(9). The record also clearly revealed that the Children had been residing in a safe and healthy pre-adoptive home where they had lived for a year prior to the termination hearing. The evidence was undisputed that the Children were thriving and happy in the foster home. The Juvenile Court properly terminated Mother's parental rights.

## V. CONCLUSION

The judgment of the trial court is affirmed and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are assessed to the appellant, Tiffany L. W.

_____

JOHN W. McCLARTY, JUDGE